NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10667


COMMONWEALTH  vs.  KENJI DRAYTON.



Suffolk.     April 10, 2015. - October 1, 2015.

Present:  Gants, C.J., Botsford, Duffly, Lenk, & Hines, JJ.


Homicide.  Firearms.  Evidence, Expert opinion, Fingerprints,
     Hearsay, Declaration of deceased person.  Constitutional
     Law, Right to hearing.  Witness, Expert.  Practice,
     Criminal, Capital case, New trial, Hearsay, Assistance of
     counsel.



Indictments found and returned in the Superior Court
Department on December 11, 2001.

The cases were tried before Regina L. Quinlan, J., and
motions for a new trial, filed on December 12, 2006, and April
2, 2012, were heard by her.


Cathryn A. Neaves for the defendant.
Teresa K. Anderson, Assistant District Attorney, for the
Commonwealth.


LENK, J.  The defendant was convicted of murder in the

first degree for a shooting that took place in an alleged

territorial conflict over the control of a "crack house," an

apartment used to sell "crack" cocaine.  The bulk of the

evidence at trial against the defendant and his codefendant at trial, Levino Williams, who was acquitted, derived from the testimony of a single witness, James Jackson.  Jackson was a crack addict and alcoholic who lived in the apartment, allowed others to sell drugs there in exchange for free drugs, and claimed to have witnessed the defendant shoot the victim, Michael Greene.  Approximately one and one-half years after the defendant's conviction, another individual, Debra Bell,[1] came forward.  Explaining that she had been diagnosed with metastatic cancer and did not want her failure to disclose what she knew about the shooting on her conscience, Debra claimed in an affidavit that she was with Jackson using drugs and having sex in the bathroom of the apartment at the time the shooting took place, and that as a result Jackson could not have seen the shooting.

Based on Debra's affidavit, the defendant moved for a new trial on the ground of newly discovered evidence.  Defense counsel also moved to take a videotaped deposition to preserve Debra's testimony.  Debra died, however, one week after the motion was filed, and before the judge acted on it.  The motion judge, who was also the trial judge, concluded that Debra's affidavit was inadmissible hearsay, and denied the motion for a

---

[1]  Because Debra Bell shares a last name with her sister, Betty Jo Bell, who is also relevant to this case, we refer to both by their first names.

new trial. The defendant later submitted a second motion for a new trial, which the judge also denied. In that motion, the defendant argued that trial counsel acted ineffectively in failing to call an expert witness regarding the effects of drug and alcohol use or sleep deprivation on Jackson's testimony, and that he was deprived of his right to a public trial due to the unobjected-to exclusion of his mother and friend from the court room during the jury empanelment process.

The case comes to this court on a consolidated appeal from the convictions of murder in the first degree and unlawful possession of a firearm, and from the denial of the defendant's motions for a new trial. We reject the claims of error at trial that the defendant asserts, both on direct appeal and in his second motion for a new trial,[2] and decline to grant the defendant relief under G. L. c. 278, § 33E. However, with regard to the defendant's first motion for a new trial, based on newly discovered evidence, we conclude that, under the unusual circumstances of this case, there is a substantial issue whether Debra's affidavit falls within a narrow, constitutionally based exception to the hearsay rule, which applies where otherwise inadmissible hearsay is critical to the defense and bears

_____

[2] The defendant does not assert before this court the arguments that he made in his second motion for a new trial, but we review them pursuant to our obligations under G. L. c. 278, § 33E.

persuasive guarantees of trustworthiness.  We therefore remand for an evidentiary hearing on that issue.[3]

1.  Background.  a.  Evidence at trial.  The Commonwealth offered evidence at trial that supported the following theory of the crime.  Since 1993, Jackson had leased an apartment in Boston.  Several months before the shooting, Jackson became acquainted with Greene, who was a crack dealer.  In exchange for money and free drugs, Jackson authorized Greene to sell crack cocaine out of the apartment, and permitted other individuals to use crack cocaine in the apartment.

In the weeks leading up to the shooting, Jackson and Greene had entered into a dispute, due to Greene's increasingly violent behavior and his efforts to exert control over the apartment. At the same time, Jackson entered into an arrangement with the defendant, and with his codefendant, Williams, similar to his arrangement with Greene:  Jackson permitted them to sell drugs from the apartment, and in exchange received from them free drugs and financial support.  One week before the shooting, Jackson informed Greene that he no longer wanted him selling drugs in the apartment.

On the day of the shooting, September 20, 2001, the defendant and Williams were in the apartment, rolling "oolies" -

_____

[3]  We recognize that the trial judge is now retired and that such a hearing must be conducted by a different judge.

- cigarettes laced with cocaine and "reefer" -- and drinking. Greene appeared, and Jackson again informed him that he was no longer permitting him to sell drugs in the apartment. Greene became enraged. He made a call from a cellular telephone, and threatened to "kill 'em all" and burn down the apartment. While Greene was on the telephone, Jackson went into the bathroom. As Jackson was preparing to leave the bathroom, he heard a gunshot. When he emerged from the bathroom and entered the living room, he observed the defendant fire five additional shots at Greene. The defendant shot the victim using a gun that Jackson had observed in the defendant's waistband several days previously.

At trial, Jackson was the sole percipient witness to the shooting; he was also the sole source of evidence regarding the conflict among the defendant, Williams, and Greene that allegedly motivated the shooting. The problems with Jackson's credibility were legion. He indicated that he had begun drinking alcohol at age seven, began using cocaine at age twenty-eight, and had been using crack cocaine for nearly a decade prior to the shooting. He acknowledged that he had been smoking crack and drinking alcohol on the day of the shooting, and had been awake nearly continuously in the days leading up to the shooting. He explained his belief that that his drug and alcohol use would not have affected his ability to perceive the shooting by noting that, because he had been using drugs and

alcohol "24-7 . . . over a period of years," he was "immune" to the effects of them.

Jackson's testimony at trial contradicted his initial statement to police during an emergency 911 call, in which he indicated that an unknown assailant had pushed through the apartment door and shot Greene. His testimony at trial also partly contradicted prior testimony before the grand jury. Jackson told the grand jury that he saw Williams standing close behind the defendant as the defendant fired at Greene. At trial, however, Jackson asserted that this testimony was untrue, and that he had not seen Williams when the defendant shot Greene.

Jackson's testimony was replete with other inconsistencies and seeming obfuscations. For instance, Jackson insisted that his earlier statement to police officers that he "had a pint of Hennessy" on the day of the shooting did not mean that he drank a pint of Hennessy cognac on that day, but merely that he possessed a pint of Hennessy, of which he drank some. Confronted with the apparent conflict between his grand jury testimony that he "never slept" on the day before the shooting and his trial testimony that he "took a nap" the night before the shooting, Jackson insisted that he did not "call taking a nap sleeping," but merely "resting [his] eyes." Similarly, while Jackson provided the times for various events to police

officers in an initial interview on the day of the shooting, he asserted at trial that "all those times were just a guess time," explaining that he "didn't keep up with no time" because he "had no place to go" and "didn't have to worry about the time." Jackson acknowledged near the end of his testimony that he "made a whole lot of mistakes in [his] testimony."

Despite the severe challenges to Jackson's credibility, the Commonwealth offered little additional evidence to corroborate his account.  The Commonwealth never located the firearm used in the shooting.  The physical evidence offered at trial linking the defendant to the apartment was limited to a beer bottle, which a prosecution expert testified contained a latent fingerprint that matched the defendant's right middle finger joint, and a cellular telephone, which was traced to a person known to both the defendant and Williams.  Several items of physical evidence, including the telephone and crack cocaine seized from the apartment, were lost while in police custody before the trial.

b.  Postconviction proceedings.  A Superior Court jury convicted the defendant of murder in the first degree, on theories of both deliberate premeditation and extreme atrocity or cruelty, in April, 2005.  The defendant also was convicted of unlawful possession of a firearm.  Williams, who was tried with the defendant as a joint venturer, was acquitted of the same

offenses.

On December 12, 2006, while the defendant's appeal of his convictions was still pending, the defendant filed his first motion for a new trial based on newly discovered evidence, in the form of Debra's affidavit.  Debra had given a statement to police shortly after the shooting, but she had otherwise avoided speaking to attorneys and others investigating the crime.  In her affidavit, she claimed that her statement to police was "not completely truthful" because she "was afraid of the officers, . . . did not want to get involved in the case," and had been told that "the officers . . . would take care of arrest warrants that were pending against [her] in different courts."  She apparently made herself unavailable to testify at a motion to suppress hearing that occurred shortly before trial, and at trial itself.

Whereas Jackson testified at trial that he was in the bathroom by himself when the first shot was fired, and emerged from the bathroom to witness the defendant fire several additional shots at the victim, Debra asserted in her affidavit that she was in the bathroom with Jackson at the time of the shooting, and that Jackson remained in the bathroom for the entirety of the shooting.  Debra said that, after hearing noises from outside the bathroom, she waited a few minutes before opening the door and "briefly peek[ing] out," at which point she

saw "a person's legs on the floor." She "screamed to . . . Jackson to look out the door," to which he "replied the 'Hell with it' or words to that effect and slammed the door closed," stating that "he did not care about what was going on." Debra concluded that "there was absolutely no way that either he or [she] could have seen who shot . . . Greene or who was in the apartment at that time."

After Debra's death in December, 2006, defense counsel submitted additional support for his first motion for a new trial, in the form of affidavits from two additional witnesses. One affidavit came from Betty Jo, Debra's sister. Like Debra, Betty Jo also gave a statement to police shortly after the shooting, although she too claimed that she was "not truthful" because she "was afraid of the officers" and they had offered to "'clear' about three warrants that were pending for [her] arrest" if she cooperated with them. Betty Jo also testified at a hearing on the defendants' pretrial motions to suppress, her name appeared on the Commonwealth's witness list for trial, and she was available to testify during the trial. Shortly before the trial, however, she indicated that she refused to speak to defense counsel, and neither party called her at trial.

In her affidavit, Betty Jo indicated that "[e]very now and then after the shooting on September 20, 2001, . . . Debra . . . would tell [her] about what had occurred in the apartment . . .

and she would say that she and . . . Jackson were in the bathroom getting high on crack cocaine and engaging in sexual activity when the shooting occurred." Betty Jo also claimed that Jackson had admitted to her, nearly five years after the shooting, that he and Debra were in the bathroom "doing their thing" and that he "did not know what was going on" at the time of the shooting. Betty Jo stated that she had accompanied Debra to her interview with police after the shooting, and both had been independently interviewed by officers investigating the crime. She asserted that, during the interview, police officers sought to prompt her to identify certain photographs even though she did not recognize them.

Defense counsel also submitted two affidavits from an individual named Joseph Anderson, which further support Debra's account of the events leading up to the shooting. Anderson indicated that he went to Jackson's apartment on September 20, 2001, to purchase crack cocaine for a friend. He stated that, after he made the purchase from Jackson, he "saw . . . Jackson going into the bathroom with a black woman, who was known to [him] as Debra." Anderson observed "two black males and one black female sitting . . . in the parlor" when he purchased the crack cocaine; upon leaving, he also "saw a black male, who was standing in the hallway in the apartment arguing with a light skinned male, who appeared to be Puerto Rican." Finally,

Anderson indicated that, "[a]bout three or four days after the shooting," he encountered Jackson at a liquor store. The two conversed, and Jackson allegedly said that he did not "know anything about" the shooting and did not "give a fuck about it."

In November, 2007, the motion judge, who was also the trial judge, denied the defendant's first motion for a new trial in a brief opinion. The judge explained that she initially considered holding an evidentiary hearing, but concluded based on her review of the affidavits that an evidentiary hearing was not necessary. The judge explained that, were Debra alive, "her testimony . . . would tend to impeach the testimony of Jackson [and] would not be sufficient to warrant a new trial." The judge further observed that Debra's alleged statements would not be admissible as a "dying declaration" because they did not concern the cause or the circumstances of her own death. Although the defendant argued that his constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights required the admissibility of the affidavit regardless whether it constituted a dying declaration under State evidentiary law, the judge's decision did not address that argument.

The defendant filed a second motion for a new trial in April, 2012. There he asserted an ineffective assistance of

counsel claim, based on trial counsel's failure to offer expert testimony regarding the impact of sleep deprivation on perception and memory to impeach Jackson's testimony, and a claim for a violation of the right to a public trial, based on the alleged exclusion of a family member and a friend from the jury empanelment process. After an evidentiary hearing, the judge denied the defendant's second motion for a new trial.

2. Discussion. The defendant raises three specific issues on appeal; in addition, he urges the court to grant him relief pursuant to its general superintendence power under G. L. c. 278, § 33E. The first issue relates to the conduct of the trial itself: the defendant contends that the trial judge improperly admitted certain testimony of the Commonwealth's fingerprint expert. We reject that argument, as well as the two arguments that the defendant asserted in his second motion for a new trial, and decline to grant the defendant relief under G. L. c. 278, § 33E. The second issue relates to the judge's denial of the defendant's motion for a new trial based on newly discovered evidence. We conclude that the defendant's motion raised a substantial issue, and therefore remand for an evidentiary hearing. The third issue relates to defense counsel's posttrial conduct with respect to the defendant's motion for a new trial: the defendant argues that defense counsel did not act sufficiently quickly to move for a

videotaped deposition of Debra, thus depriving the defendant of effective assistance of counsel.  In light of our remand for an evidentiary hearing on the defendant's motion for a new trial based on newly discovered evidence, we decline to reach that issue.

a.  Issues on direct appeal.  The Commonwealth's expert testified that she "individualized or identified" a latent fingerprint found on a beer bottle at the crime scene to defendant's "right middle finger joint."  The defendant contends that the admission of this testimony was in error.  Because trial counsel did not object, we review to determine "whether there was error, and if so, whether it created a substantial likelihood of a miscarriage of justice."  Commonwealth v. Perez, 460 Mass. 683, 689-690 (2011).

We have "concluded that the underlying theory and process of latent fingerprint identification . . . are sufficiently reliable to admit expert opinion testimony regarding the matching of a latent impression with a full fingerprint" (citation and quotation omitted).  Commonwealth v. Wadlington, 467 Mass. 192, 204 (2014).  We have "warned," however, "that testimony to the effect that a print matches, or is 'individualized' to, a known print should be presented as an opinion, not a fact, and opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a

print should be avoided" (citation, quotation, and alterations omitted). Id. Here, on direct examination, the expert testified that the print was "individualized or identified" with the defendant's print, but did not describe that individualization as an absolute certainty. On cross-examination the expert did indicate that she was "positive that [she] identified" the defendant's print. Because this testimony occurred on cross-examination, however, and because there was no motion to strike, we identify no error in the testimony, much less an error sufficient to create a substantial likelihood of a miscarriage of justice. See id. at 205.

b. Relief under G. L. c. 278, § 33E. Pursuant to our obligations under G. L. c. 278, § 33E, we have reviewed the entire record and considered the issues raised in the defendant's second motion for a new trial. We agree with the motion judge's determination that, because the effects of Jackson's alcohol and drug use and sleep deprivation on his capacity to perceive and recall events were thoroughly developed through cross-examination, calling an expert on those issues would not have accomplished something meaningful for the defense. We also conclude that the motion judge properly determined that the defendant had not borne his burden of demonstrating that the court room was closed during any portion of the jury selection, because the defendant offered no evidence

indicating that the court room was closed by any specific order or that court officers ever told anyone to leave. We identify no basis to exercise our authority pursuant to G. L. c. 278, § 33E, either to reduce the verdict of murder in the first degree or to order a new trial.

c. Motion for a new trial on the basis of newly discovered evidence. Under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a trial judge "may grant a new trial at any time if it appears that justice may not have been done." Where the defendant moves for a new trial on the basis of newly discovered evidence, the defendant "must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction," which entails a showing that it "probably would have been a real factor in the jury's deliberations." Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986). The defendant "also bears the burden of demonstrating that any newly discovered evidence is admissible." Commonwealth v. Weichell, 446 Mass. 785, 799 (2006).

In adjudicating a motion for a new trial, the "judge may rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c), as appearing in 435 Mass. 1501 (2001). "When a substantial issue has been raised,

and supported by a substantial evidentiary showing," however, "the judge should hold an evidentiary hearing" (citation and quotation omitted). Commonwealth v. Muniur M., 467 Mass. 1010, 1011 (2014). See also Reporters' Notes to Rule 30, Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1709 (LexisNexis 2014-2015) ("Where a substantial issue is raised, . . . the better practice is to conduct an evidentiary hearing"). We generally review a judge's decision on a motion for a new trial under an abuse of discretion standard. Commonwealth v. Muniur M., supra at 1012. Where the defendant's motion for a new trial raises an issue "of constitutional dimension," however, "we are not bound by an abuse of discretion standard, but rather examine the issue independently." Commonwealth v. Conkey, 443 Mass. 60, 66-67, (2004), S.C., 452 Mass. 1022 (2008). Because we conclude that the defendant's first motion for a new trial raises a sufficiently substantial issue whether Debra's affidavit falls within a narrow, constitutionally based exception to the hearsay rule, we remand for an evidentiary hearing.

The judge's decision to deny the defendant's first motion for a new trial without holding an evidentiary hearing appears to have rested in large part on the judge's determination that Debra's affidavit was not admissible as a dying declaration. That determination, as the defendant concedes, was correct.

Under the "dying declaration" exception to the hearsay rule, "a statement made by a declarant-victim" is admissible in a prosecution for homicide, provided that the statement was made "under the belief of imminent death," that the declarant "died shortly after making the statement," and that the statement "concern[ed] the cause or circumstances of what the declarant believed to be her own impending death." Commonwealth v. Nesbitt, 452 Mass. 236, 251-252 (2008). Because Debra's statement in her affidavit did not concern the cause or circumstances of her impending death, her statement is not admissible under the traditional hearsay exception for dying declarations.

The defendant also correctly concedes that this court has not yet recognized, as a matter of evidentiary law, any other hearsay exception that would encompass Debra's affidavit. For instance, the Federal rules of evidence include a "residual" exception, which allows the admission of hearsay evidence that is not admissible under any other exception where the court determines that (a) "the statement has equivalent guarantees of trustworthiness"; (b) "the statement is offered as evidence of a material fact"; (c) the statement "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"; and (d) "the purposes of [the] rules [of evidence] and the interests of

justice" will best be served by the admission of the statement into evidence.  Fed. R. Evid. 807.  Thirty-one States have adopted some form of a "residual" or "catchall" exception to the hearsay rule, often patterned on the Federal rule.[4]  On several occasions, however, this court has declined to recognize an "'innominate' or residual exception to the hearsay rule" (citation and quotation omitted) akin to the Federal residual exception.  Commonwealth v. Pope, 397 Mass. 275, 281-282 (1986). See Commonwealth v. Semedo, 422 Mass. 716, 728 (1996); Commonwealth v. Costello, 411 Mass. 371, 377 (1991); Commonwealth v. Meech, 380 Mass. 490, 496-497 (1980); Commonwealth v. White, 370 Mass. 703, 713 (1976); M.S. Brodin & M. Avery, Handbook of Massachusetts Evidence § 8.25 (8th ed. 2007).

In nearly all of those States that, like Massachusetts, have not adopted a broader residual hearsay exception akin to

---

[4] See Alaska R. Evid. 804(b)(5); Ariz. R. Evid. 807; Ark. R. Evid. 804(b)(5); Colo. R. Evid. 807; Conn. Code Evid. 8-9; Del. R. Evid. 807; Ga. Code Ann. § 24-8-807 (LexisNexis 2015); Haw. Rev. Stat. § 626-1, Rule 804; Idaho R. Evid. 804; Iowa Code Ann. § 5.807 (West 2014); La. Code Evid. art. 804(b)(6); Md. Rule 5-803(b)(24); Mich. R. Evid. 804(b)(7); Minn. R. Evid. 807; Miss. R. Evid. 804(b)(5); Mont. R. Evid. 804(b)(5); Neb. Rev. Stat. § 27-804(2)(e); Nev. Rev. Stat. § 51.315; N.H. R. Evid. 804(b)(6); N.M. R. Evid. 11-807(A); N.C. Gen. Stat. 8C-1, 804(b)(5); N.D. R. Evid. 807(a); Okla. Stat. tit. 12, § 2804.1; Or. Rev. Stat. § 40.465(3)(h); R.I. R. Evid. 804(b)(5); S.D. Codified Laws § 19-19-807; Utah R. Evid. 807(a); W. Va. R. Evid. 807(a); Wis. Stat. § 908.045(6); Wyo. R. Evid. 804(b)(6).  See also Robinson v. Commonwealth, 258 Va. 3, 10 (1999).

the Federal rule, courts and commentators have acknowledged the existence of a far narrower, constitutionally based hearsay exception, rooted in the United States Supreme Court's decision in Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (Chambers).[5]

---

[5] See Ex parte Griffin, 790 So. 2d 351, 355 (Ala. 2000) ("[W]e follow the United States Supreme Court's holding in Chambers and hold that [the defendant's] constitutional rights supersede the hearsay rule in the Alabama Rules of Evidence"); People v. Blair, 25 Cal. 3d 640, 665 (1979) (en banc) (acknowledging that, under Chambers, court may "not elevate a fastidious adherence to the technicalities of the law of evidence over the right to a fair trial"); Marek v. State, 14 So. 3d 985, 995 (Fla. 2009) (acknowledging that, in some circumstances, Chambers requires admission of otherwise inadmissible hearsay, but "only where the [statement] sought to be admitted bears indicia of reliability"); People v. Tenney, 205 Ill. 2d 411, 434 (2002) (concluding, based on Chambers, that, "where hearsay testimony bears persuasive assurances of trustworthiness and is critical to the accused's defense, its exclusion deprives the defendant of a fair trial in accord with due process"); Thomas v. State, 580 N.E.2d 224, 227 (Ind. 1991) (altering State evidentiary law to bring it into compliance with Chambers); State v. Hills, 264 Kan. 437, 445 (1998) ("Kansas courts have . . . disallowed the mechanical application of evidentiary rules where the failure to do so would result in the State not receiving a fair trial"); Crawley v. Commonwealth, 568 S.W.2d 927, 931 (Ky. 1978) (adopting a broader exception for statements against interest to bring State evidentiary law into compliance with constitutional requirements articulated in Chambers); State v. Webb, 424 So. 2d 233, 238-240 (La. 1982) (reversing conviction of murder after determining that trial judge's restriction on defense counsel's cross-examination of police detective regarding alleged third party's confession "represent[ed] error of constitutionally significant proportions"); McLaughlin v. State, 378 S.W.3d 328, 346 (Mo. 2012) ("The United States Supreme Court case of Chambers . . . set forth the constitutionally based exception to the rule against the admission of hearsay during the guilt phase of trial, which this Court applies"); State v. Bunyan, 154 N.J. 261, 265, 266 (1998) (concluding that, while "New Jersey has declined to adopt a residual exception" akin to Federal residual hearsay exception, "constitutional provisions, such as the

There the defendant sought to defend against a prosecution for murder by introducing a third party's subsequently repudiated confession to the crime.  Id. at 289-290.  The defendant's efforts were largely thwarted by the combination of the State's hearsay rule and its "party witness" or "voucher" rule, which prohibited the defense from calling the third party and then

---

compulsory process clause of the Sixth Amendment [to the United States Constitution], may require admission of evidence even though the evidence would be inadmissible according to State rules of evidence"); People v. Stultz, 2 N.Y.3d 277, 286 (2004) ("grand jury testimony of an unavailable witness . . . must be admitted when it is material, exculpatory and has sufficient indicia of reliability"); People v. Robinson, 89 N.Y.2d 648, 650 (1997) (concluding that, although not authorized by statute, defendant's "constitutional right to due process" requires admission of grand jury testimony where declarant is unavailable and hearsay testimony at issue "is material, exculpatory and has sufficient indicia of reliability"); State v. Sumlin, 69 Ohio St. 3d 105, 110 (1994) (after determining that trial court did not abuse its discretion in declining to allow statements into evidence under State evidentiary law, "consider[ing] whether fundamental principles of due process required the trial court to admit the statements"); Commonwealth v. Lewis, 472 Pa. 235, 240-241 (1977) (observing that conclusion that statements at issue "were undoubtedly hearsay . . . does not end our consideration of this issue," before analyzing admissibility of statements under Chambers); Advisory Commission Comment to Tenn. R. Evid. 804 (observing that, while "[t]here is no residual exception even where declarants are unavailable[,] [o]ccasionally . . . constitutional considerations require that a tribunal permit the accused in a criminal case to introduce trustworthy hearsay not falling within a traditional exception").  See also Inwinkelried, The Constitutionalization of Hearsay:  The Extent to Which the Fifth and Sixth Amendments Permit or Require the Liberalization of the Hearsay Rules, 76 Minn. L. Rev. 521, 547 (1992) ("To successfully invoke the constitutional right to present evidence, the accused must persuade the judge that the testimony in question is crucial to the defense").

challenging his repudiation of his confession on cross-examination.  Id. at 294.  The United States Supreme Court concluded that the application of State evidentiary rules may produce results that conflict with the defendant's rights under the compulsory process clause of the Sixth Amendment or the due process clause of the Fourteenth Amendment.  Id. at 302.  The Court observed that, "[a]lthough perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed."  Id.  Because the sworn confession at issue in the case "bore persuasive assurances of trustworthiness" and "also was critical to [the defendant's] defense," the Court concluded that "the hearsay rule may not be applied mechanistically to defeat the ends of justice."  Id.  See Green v. Georgia, 442 U.S. 95, 97 (1979) (constitutionally impermissible for State to apply hearsay rule to bar third-party confession where confession was "highly relevant to a critical issue in the punishment phase of the trial" and "substantial reasons existed to assume its reliability").

This court has already recognized a constitutionally based hearsay exception in one context.  Because the right to defend against criminal charges by presenting third-party culprit

evidence "is of a constitutional dimension," we have held that a defendant may offer otherwise inadmissible hearsay evidence to support the assertion that a third party is the true culprit, provided certain conditions are met.  Commonwealth v. Silva-Santiago, 453 Mass. 782, 801, 804 n.26 (2009).  The defendant must establish that the hearsay statement is "otherwise relevant, will not tend to prejudice or confuse the jury," displays "substantial connecting links to the crime," has "a rational tendency to prove the issue the defense raises," and is not "too remote or speculative" (citations and quotations omitted).  Id. at 804.  See Commonwealth v. Morgan, 449 Mass. 343, 355-357 (2007); Mass. G. Evid. § 1105 (2015).

To be sure, Debra's affidavit does not constitute third-party culprit evidence.  The United States Supreme Court's decision in Chambers, however, was not expressly limited to third-party culprit evidence.  The Supreme Court and other courts have applied the principle articulated in Chambers to cases that did not involve the exclusion of third-party culprit evidence.  See Crane v. Kentucky, 476 U.S. 683, 690-691 (1986) (holding that trial court violated principle articulated in Chambers when it barred defendant from introducing evidence to challenge voluntariness of his confession); State v. Bunyan, 154 N.J. 261, 265, 269-272 (1998) (applying Chambers principle to affidavit from purported eyewitness asserting that defendant did

not commit crime of which he was convicted).

We identify no persuasive reasons for confining our recognition of a constitutionally based hearsay exception to the context of third-party culprit evidence. Third-party culprit evidence challenges the prosecution's case in a way that, while potentially powerful, is ultimately indirect: it seeks to create reasonable doubt as to the defendant's guilt by suggesting that another person in fact committed the crime. An affidavit that directly contradicts the testimony of the sole purported eyewitness to a crime likewise undermines the prosecution's case in a way that is indirect yet potentially powerful. Accordingly, we believe that the principle articulated in Chambers applies to Debra's affidavit: the affidavit will be admissible, despite its failure to fall into any of our traditional hearsay exceptions, provided that the defendant establishes both that it "[i]s critical to [the defendant's] defense" and that it bears "persuasive assurances of trustworthiness." Chambers, 410 U.S. at 302.

Having recognized that the principle articulated in Chambers applies to Debra's affidavit, we conclude that the defendant's first motion for a new trial raises a substantial issue, warranting an evidentiary hearing. Debra's affidavit plainly would have been critical to the defense. The affidavit directly contradicts Jackson's testimony, indicating that he

could not possibly have observed what he claimed at trial to have observed. Jackson's other testimony suggested that both the defendant and the defendant's acquitted codefendant, Williams, had a motive to murder Greene. In the absence of Jackson's statement that he saw the defendant shooting Greene, however, there is no evidence that makes it more likely than not -- much less evidence capable of proving beyond a reasonable doubt -- that the defendant, rather than Williams, was the perpetrator.

Because Debra's affidavit is critical to the defense, its admissibility hinges on whether the defendant establishes that it bears persuasive assurances of trustworthiness. Although the record as it stands does not permit us to answer that question, the evidence submitted by the defendant establishes that there is a substantial issue whether the affidavit has sufficient assurances of trustworthiness. In reaching this determination, we draw on several instructive similarities between the circumstances at issue here and those involved in Chambers. Cf. Montana v. Egelhoff, 518 U.S. 37, 52-53 (1996) (plurality opinion) (characterizing Chambers as "fact-intensive" and "an exercise in highly case-specific error correction"); State v. Bunyan, 154 N.J. at 270 ("Because the holding of Chambers is so intimately related to the facts and circumstances of that case, . . . we must consider the facts of Chambers and compare

them to the facts of this case" [citation and quotation omitted]).

In Chambers, 410 U.S. at 300-301, the United States Supreme Court observed that, while the hearsay statement at issue fell outside of the hearsay exception for statements against interest, the admission of the statement was consistent with the underlying "rationale" for that exception. Here, similarly, while Debra's affidavit fails to satisfy the technical requirements for the dying declaration hearsay exception, it appears to fall within the rationale for the exception. A traditional justification for the dying declaration exception is that, when a person is "under a sense of impending death" and "every hope of this world is gone[,] . . . the mind is induced by the most powerful considerations to speak the truth" (citations and quotations omitted). Giles v. California, 554 U.S. 353, 397 (2008). See Chia v. Cambra, 360 F.3d 997, 1006 (9th Cir. 2004) (although hearsay statement at issue did "not technically meet the definition of a dying declaration, it was given when [the declarant] knew that he was in real danger of imminent death -- a traditional indicium of reliability"). Consistent with that justification, in her affidavit Debra attributed her decision to come forward to the "uncertainty of [her] medical condition" and her desire to clear her conscience of her prior failure to come forward with what she knew about

the shooting. Indeed, according to Betty Jo, Debra's plea that she "make the truth known about the shooting in . . . Jackson's apartment" was her "sister's dying words." These circumstances, particularly given that the Commonwealth has as of yet offered no alternative explanation for why Debra would have an incentive to lie in her affidavit, tend to support the trustworthiness of Debra's statement.

The United States Supreme Court also observed in Chambers, 410 U.S. at 300, that the hearsay statement at issue bore persuasive assurances of trustworthiness because it "was corroborated by some other evidence in the case." Here similarly, Debra's affidavit is corroborated by Jackson's own initial statements to police, in which he asserted that he did not see the shooter. The four affidavits of Debra, Betty Jo, and Anderson, moreover, bolster one another through their inclusion of shared details. For instance, Jackson testified at trial that only he, the defendant, Williams, and the victim were present in the apartment at the time of the shooting. Both Debra and Anderson, however, indicate that there were others present moments before the shooting. Debra and Anderson appear to have observed one another, with Anderson remarking that he "saw . . . Jackson going into the bathroom with a black woman . . . known to [him] as Debra," and Debra observing that she saw "a black male known to [her] as Joe." Both Debra and

Betty Jo also observed the presence of a woman known to them as "Sandra."

Finally, in Chambers the Supreme Court remarked that the third party confessed on multiple occasions.  The Court concluded that "[t]he sheer number of independent confessions provided additional corroboration for each," particularly since each confession "was made spontaneously to a close acquaintance shortly after the murder had occurred."  Id.  Here, Betty Jo's affidavit indicates that, following the shooting and until Debra's death, Debra on multiple occasions told her "that she and . . . Jackson were in the bathroom at the time of the shooting and that they could not see what had occurred or who had been involved in the shooting."

In identifying these elements that arguably may support the trustworthiness of Debra's affidavit, we do not in any way suggest that the affidavit ultimately is admissible.  We conclude only that there is a substantial issue whether Debra's affidavit is supported by sufficiently persuasive guarantees of trustworthiness that it is admissible under the constitutional principle articulated in Chambers, and that the resolution of that issue will benefit from an evidentiary hearing.[6]

---

[6] There is no indication in the record that either Betty Jo or Anderson is unavailable to testify and expand upon the matters addressed in their affidavits.  Were they to testify at an evidentiary hearing on the defendant's motion for a new

If the judge determines on remand that Debra's affidavit is supported by sufficiently persuasive guarantees of trustworthiness to be admissible, the result will not be an automatic new trial.  Instead, the judge must then decide whether Debra's affidavit, together with the evidence offered by Betty Jo and Anderson, satisfies the established standard for a motion for a new trial.  That standard requires a showing "both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction."  Commonwealth v. Grace, 397 Mass. at 305.  The inquiry into whether the defendant has satisfied the new trial standard is conceptually distinct from the threshold inquiry into whether Debra's affidavit is admissible at all, although many of the same considerations that inform a judge's assessment of the affidavit's trustworthiness may well also inform the judge's assessment whether it casts real doubt on the justice of the conviction.[7]

---

trial, the judge could assess their credibility as it bears on the trustworthiness of Debra's affidavit.  Similarly, there may also be testimony taken from the lawyer who prepared Debra's affidavit, who could provide information about her physical and mental condition at the relevant time.  The Commonwealth likewise could call witnesses and probe factors relating to, among other things, Debra's potential motives and state of mind at the time she gave her affidavit and before her death.  For instance, it could be explored whether Debra had any sort of relationship with the defendant that might have created a motive for her to lie in order to support the defendant's motion for a new trial.

[7] In addition to concluding that Debra's affidavit was not

To establish that evidence is "newly discovered," the defendant must show that the evidence was "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial." Id. at 306. The Commonwealth asserts that, regardless of whether the affidavit is admissible, it is not newly discovered. The Commonwealth concedes that Debra was unavailable at the time of the trial, given the prosecution's unsuccessful efforts to locate her. The Commonwealth, however, contends that Betty Jo was available at the time of trial. Because Betty Jo allegedly knew that her sister claimed to have been in the bathroom with Jackson at the time of the shooting, and because defense counsel chose not to call Betty Jo as a witness, the Commonwealth contends that the defendant has not met his burden of showing that the substance of Debra's affidavit was not reasonably discoverable at the time of the trial.

---

admissible as a dying declaration, the judge also determined that Debra's statements "would not be sufficient to warrant a new trial" because it only "tend[s] to impeach the testimony of Jackson." In Commonwealth v. Cowels, 470 Mass. 607, 621 (2015), however, which we decided after the judge denied the defendant's first motion for a new trial, we clarified that "we have never adopted an inflexible rule that newly discovered evidence that merely corroborates or impeaches a witness's testimony is an insufficient basis for a motion for a new trial." Indeed, we noted that, "in rare cases, a new trial may be warranted where the Commonwealth's case depends so heavily on the testimony of a witness and where the newly discovered evidence seriously undermines the credibility of that witness" (citations, quotations, and alterations omitted). Id.

The motion judge did not address the question whether the evidence offered by the defendant was newly discovered, likely because of her determination that, in any event, Debra's affidavit would not be admissible. Like the issue whether Debra's affidavit bears persuasive assurances of trustworthiness, we believe that the question whether the substance of Debra's affidavit is newly discovered warrants an evidentiary hearing. We note, for instance, that Betty Jo's affidavit indicates that she was "not completely truthful" with the police officers who questioned her because she "did not want to get involved in the case," and that she stated at the suppression hearing conducted shortly before the trial that she refused to speak with defense counsel. We also have no information about whether Anderson was available at the time of the trial. In light of these circumstances, we think that the answer to the question whether "reasonable pretrial diligence would . . . have uncovered" (quotation omitted) the information contained in Debra's affidavit hinges on questions of fact that warrant an evidentiary hearing. Commonwealth v. Weichell, 446 Mass. 785, 799 (2006).

We conclude by emphasizing the narrowness of the constitutional principle that governs this case and necessitates our remand. Our decision does not signal a departure from our long-standing refusal to adopt a broad residual hearsay rule

modeled on the Federal rule. In the vast majority of cases, the established hearsay exceptions will continue to govern the admissibility of hearsay evidence at most criminal trials, with this constitutional hearsay exception operating only in the rarest of cases, where otherwise inadmissible evidence is both truly critical to the defense's case and bears persuasive guarantees of trustworthiness.

d. <u>Ineffective assistance of counsel based on defense counsel's posttrial conduct</u>. The defendant argues that, if this court concludes that Debra's affidavit is not admissible, then we should find that counsel provided ineffective assistance in failing to act immediately to preserve Debra's testimony, and that counsel's error caused a substantial likelihood of a miscarriage of justice. Because of the inadequacy of the record before us at this point and because we are remanding the case for a determination whether Debra's affidavit is admissible under the standard articulated in <u>Chambers</u>, we decline to reach the defendant's ineffective assistance of counsel claim based on defense counsel's posttrial conduct. If the judge on remand concludes that the affidavit is not admissible, the defendant may then bring a motion for a new trial based on defense counsel's allegedly ineffective posttrial conduct in handling the defendant's motion for a new trial.

3. <u>Conclusion</u>. The defendant's convictions are affirmed,

as is the order denying the defendant's second motion for a new trial.  The order denying the defendant's first motion for a new trial, however, is vacated, and the case is remanded to the Superior Court for further consideration of that motion in a manner consistent with this opinion.

<u>So ordered</u>.