NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12198

COMMONWEALTH  vs.  PETER DECONINCK.


Suffolk.     April 6, 2018. - August 10, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Kafker, JJ.


Homicide.  Self-Defense.  Evidence, Self-defense, Testimony
    before grand jury, Declaration of deceased person, Hearsay,
    Prior violent conduct, Bias.  Practice, Criminal, Capital
    case, Disqualification of judge, Instructions to jury,
    Question by jury.



Indictment found and returned in the Superior Court
Department on November 20, 2013.

The case was tried before Linda E. Giles, J.


Amy M. Belger for the defendant.
Paul B. Linn, Assistant District Attorney (Masai-Maliek
King, Assistant District Attorney, also present) for the
Commonwealth.


GAZIANO, J.  A Superior Court jury convicted the defendant

of murder in the first degree on a theory of extreme atrocity or

cruelty for the fatal stabbing of Ronald Russo on August 24,

2013.  That evening, the defendant and the victim, who were

long-time friends, got into an argument and shoving match inside a mobile home. Both had been consuming alcohol before the shoving match. They then armed themselves with kitchen knives. During the ensuing fight, the defendant stabbed or slashed the victim sixty-nine times, while sustaining a stab wound to his right leg.

At trial, the defendant claimed that he had stabbed the victim in self-defense or, in the alternative, that the Commonwealth's evidence, at best, supported a conviction of voluntary manslaughter due to the excessive use of force in self-defense, sudden combat, or heat of passion.

The defendant argues that a new trial is required for a number of reasons. He contends first that he was deprived of the right to present a defense, based on the judge's rulings on the admissibility of an out-of-court statement to police made by the only eyewitness to the altercation, a few hours after the fight. The witness, a mutual friend of the defendant and the victim, was unavailable to testify because he died unexpectedly prior to trial. Over the Commonwealth's objection, the defendant was permitted to introduce the witness's grand jury testimony in evidence as prior recorded testimony. Defense counsel's repeated efforts to introduce an audio-video recording of the witness's statement to police, however, were denied on the ground that the recording was hearsay evidence. The

defendant maintains, as he did strenuously at trial, that the statement should have been played for the jury because it was admissible under the narrow exception to the hearsay rule carved out by this court in Commonwealth v. Drayton, 473 Mass. 23, 25, 40 (2015), S.C., 479 Mass. 479 (2018).

In addition, the defendant argues that he is entitled to a new trial because the judge abused her discretion in excluding so-called Adjutant evidence, including the unavailable witness's recorded statement to police and other evidence of the victim's violent conduct. See Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005). The defendant contends that this evidence suggests that the victim was the first aggressor in the knife fight. The defendant claims further that his right to a fair trial was violated by the judge's failure sua sponte to conduct a recusal analysis, given that she had found his trial counsel in contempt of court in an unrelated prior case, and that the judge improperly instructed the jury in response to a question regarding self-defense. The defendant also asks that we use our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict. For the reasons that follow, we affirm the conviction and decline to exercise our authority to grant relief under G. L. c. 278, § 33E.

1. Facts. We recite the facts the jury could have found, reserving some facts for later discussion of particular issues.

a.  Commonwealth's case.  In the summer of 2013, the victim had been staying with John Fay at a trailer park located on Revere Beach Parkway in Revere.  Sometime during the day of August 24, 2013, a neighbor encountered the victim and the defendant in the driveway of Fay's trailer.  The neighbor, who had known both the victim and the defendant for years, went inside the trailer with them and spoke with them briefly.

At around 8:15 P.M. that evening, the neighbor stopped by Fay's trailer to ask the victim for help moving an appliance.  After calling out to see if anyone was there, he entered the trailer and found that it was in complete disarray.  He saw a body on the kitchen floor and ran across the street to another neighbor to telephone 911.

The responding police officers and emergency medical technicians (EMTs) found the victim on the kitchen floor, lying on his back in a pool of blood.  There were extensive bloodstains throughout the kitchen, and the table and several chairs had been tipped over.  The victim was holding a detached blade from a chef-style knife in his right hand.  Officers found a bloodstained handle belonging to the chef-style knife, and a

bloodstained kitchen knife with a slightly bent blade, on the kitchen counter.[1]

The victim died as a result of multiple sharp force injuries.  Of the sixty-nine stab wounds, there were nineteen on his chest and stomach, twenty-six on his back, and fifteen on his hands.  Most of the wounds were superficial.  One deep stab wound in the victim's chest, and two deep stab wounds to his back, pierced internal organs; each independently would have been fatal.

Sometime around 8 P.M., a resident of the trailer park had been walking home along Revere Beach Parkway.  He a saw shirtless white male, covered in blood "from head to toe" approaching from the opposite direction.  When he reached the trailer park, he told one of the officers who had responded to the crime scene what he had seen.  As a result, officers headed to Revere Beach Parkway in search of the suspect.

A Revere police officer located the defendant at the closed Massachusetts Bay Transportation Authority Beachmont station.

---

[1] Subsequent deoxyribonucleic acid (DNA) testing of a bloodstain from the intact knife showed that the victim's blood matched the major male profile; the minor DNA profile was inconclusive.  The bloodstain on the knife handle contained a mixture of DNA that matched the defendant's DNA and the victim's DNA.  The victim's DNA matched the major DNA profile from the bloodstain on the tip of the knife blade found in the victim's hand; the defendant's DNA did not match the major male profile on the tip of the blade, and the minor DNA profile was inconclusive.

The defendant was unsteady on his feet and staggering, yanking on the station doors and biting the lock. After disregarding multiple orders to lie on the ground, and after staring for more than thirty seconds at the officer, who had drawn his weapon and was pointing it at the defendant, the defendant ultimately complied. The officer saw that the defendant was bleeding from an injury to his lower right leg. EMTs responded to the scene to treat the defendant. During this time, the defendant was combative, screaming, yelling, and threatening to kill the officers and EMTs.

The defendant was transported to a hospital for further treatment.[2] At around 10 P.M., a State police detective entered the defendant's hospital room. Upon seeing the detective, the defendant said, "I don't remember where I was." The defendant then declined to be interviewed, and the detective left the room. The defendant later called for the detective to come back. While the detective was attempting to read the defendant the Miranda rights, the defendant interrupted and said that the victim had stabbed him first in the leg. The defendant later called the detective a "moron," and requested to be taken to court because "it was self-defense." In a subsequent statement

---

[2] The defendant's medical records indicate that he was treated for a wound on the back of his right leg that appeared to look more like a "stab injury." He also had abrasions on his left leg, face, hands, and fingers.

to police, the defendant said that he had been at his friend "Johnny Fay's" house, he had not killed anyone, and he had been shot or stabbed in the back of his leg.

At trial, the Commonwealth played for the jury thirty-nine short "snippets" from twenty-four recorded telephone calls made by the defendant from the Suffolk County jail approximately one month after his arrest.[3]  In these telephone conversations, the defendant said that he stabbed the victim in self-defense, he had been stabbed multiple times by the victim, he had not intended to kill the victim, and he had been impaired by Klonopin or Xanax.  At other points, the defendant characterized himself as a "stone cold killer" and reported that he had "knocked [the victim] out, [taken] the knife, and . . . kept sticking till [the victim] stopped moving."

b.  Defendant's case.  The only percipient witness, John Fay, died unexpectedly prior to trial.  In support of his theory of self-defense, and that the victim had been the first

---

[3] The Commonwealth introduced two compact discs (CDs) containing 174 recorded telephone calls from the Suffolk County jail, between August 27, 2013, and October 18, 2013, but played only certain small portions for the jury.  The judge initially allowed the recordings of the calls to be introduced in their entirety and to be available for the jury to play during deliberations.  She later ordered portions of the recordings redacted as not relevant.  Ultimately, toward the end of the trial, the prosecutor and defense counsel agreed to the admission of certain portions of specific calls.  The two CDS were withdrawn, and the jury were given a recording of only those calls.

aggressor, the defendant introduced Fay's grand jury testimony as prior recorded testimony. A transcript of Fay's grand jury testimony was read into the record; trial counsel read the prosecutor's questions and counsel's investigator read Fay's responses.

Fay's testimony is summarized as follows. On the morning of August 24, 2013, the victim went to Revere Beach, where he encountered the defendant, who was one of his long-time friends. The victim invited the defendant and the defendant's brother back to Fay's trailer. While Fay was in the kitchen cooking, the others were talking and drinking vodka. The victim and the defendant also sniffed cocaine, and the defendant took some prescription pills.[4] Other friends stopped by, and the victim instigated a shoving match with one of the guests.

By 6 P.M., the other guests had left and only the defendant and the victim remained in the trailer with Fay. The others decided to leave because "[the victim] was being disruptive, pounding on the table. He was drunk and . . . it wasn't a good scene . . . ." The victim pushed Fay into the stove so hard that a pot was almost knocked over. The defendant, who had been sitting at the kitchen table, stood up and told the victim to leave Fay alone and to stop causing trouble. This resulted in

---

[4] When the defendant was arrested, police seized a bottle of Xanax pills from his pants pocket.

several arguments and shoving matches between the victim and the defendant. The quarrel became more heated when the defendant mentioned "an old prison beef." They also quarreled because the defendant said the victim had stolen prescription pills from him earlier that day. Fay separated the victim and the defendant three or four times.

While Fay was in the bathroom, he heard the two men continuing to argue about the allegedly stolen pills. From the hallway, Fay saw the two seated at opposite ends of the kitchen table. The defendant jumped up from his chair, lifting the table off the floor in doing so. He went around the table toward the victim. The victim jumped up to face the defendant. According to Fay, the defendant and the victim each took a knife from the table. Fay did not actually see either man reach for a knife, and could not tell who was the first to arm himself. "[I]t just happened so quick. I just saw two people with knives. I don't know how or what they grabbed."

The victim and the defendant moved to the side of the table. Fay saw them "stabbing each other." He did not see whether the victim or the defendant was the first to swing a knife or stab the other. "I don't know who struck who or whatever. They were wrestling back and forth, and then I saw the knives, and then I seen each other sticking. I don't know who struck who first." Fay described the victim as "fighting

for his life" against a much larger and more hostile opponent.[5] The victim and the defendant swung their knives at each other "back and forth." The defendant got the better of the victim, and connected at least three to five times. The victim collapsed on the kitchen floor, and the defendant fled the trailer. Fay did not telephone for help. He left to go to a neighborhood bar.[6]

The defendant called two expert witnesses. The first, a chemist, extrapolated from the defendant's blood alcohol content (BAC) of 0.11 when he was admitted to the hospital, and opined that the defendant had had a BAC of approximately 0.15 to 0.16 earlier in the evening. The expert also testified to the effects of Xanax and cocaine on cognitive functioning. The second expert, a forensic neuropsychologist, testified that the defendant suffered from impaired judgment and impulse control due to past traumatic brain injuries, depression, and substance abuse.

The judge instructed the jury on self-defense, murder in the first degree on a theory of extreme atrocity or cruelty,

---

[5] According to Fay, the victim was six feet tall and weighed approximately 220 pounds, and the defendant was six foot three or four inches tall and weighed approximately 280 pounds.

[6] Some of Fay's testimony to the grand jury was consistent with what he had told police in the audio-video recorded statement a few hours after the incident; other portions differed or were more detailed.

murder in the second degree, and voluntary manslaughter on theories of excessive force in self-defense, heat of passion, and sudden combat. The jury convicted the defendant of murder in the first degree.

2. Discussion. In this direct appeal, the defendant contends that Fay's recorded statement to police was admissible under an exception to the hearsay rule discussed in Drayton, 473 Mass. at 25, 40, because it bore indicia of reliability, was contemporaneous with the events, and was critical to his defense; the defendant argues that the denial of his motion to introduce this evidence deprived him of the right to present a defense and requires a new trial. Second, the defendant asserts that the judge abused her discretion in excluding other Adjutant evidence concerning prior acts of the victim. Third, the defendant contends that the judge should have considered recusing herself, sua sponte, after considering her order of civil contempt against his trial counsel in an unrelated case prior to his trial. The defendant argues that the judge's bias toward his counsel, and her decision not to even consider recusing herself, deprived him of the right to a trial by a fair and impartial tribunal. Fourth, the defendant argues that the judge's answer to a jury question concerning self-defense foreclosed the possibility of a lesser verdict of voluntary manslaughter. In addition, the defendant asks us to exercise

our extraordinary authority to overturn the conviction and order a new trial, or to reduce the verdict.

a. Admissibility of Fay's videotaped statement. In Drayton, 473 Mass. at 33, we considered whether to adopt a narrow, constitutionally based exception to the hearsay rule. In the "unusual circumstances" presented in that case, the defendant sought to admit an affidavit of a deceased witness as newly discovered evidence in support of a motion for a new trial. Id. at 25, 27-28. Applying the dying declaration exception to the hearsay rule, the judge had excluded the affidavit and denied the motion for new trial. Id. at 32.

We concluded that the affidavit "plainly would have been critical to the defense" because it directly contradicted the sole eyewitness's testimony implicating the defendant in the fatal shooting. Id. at 36. Recognizing a constitutionally based hearsay exception "rooted in the United States Supreme Court's decision in Chambers v. Mississippi," 410 U.S. 284, 302 (1973), we held that the deceased witness's affidavit could be admissible at postconviction proceedings, notwithstanding that it did not fall into any traditional category of a hearsay exception. Drayton, 473 Mass. at 33, 36. See Chambers, supra ("hearsay rule may not be applied mechanistically to defeat the ends of justice"). Accordingly, we remanded the case to the Superior Court to allow the defendant to establish that the

deceased witness's affidavit was sufficiently reliable. Drayton, supra at 36, 40. Notwithstanding this ruling, the opinion ended "by emphasizing the narrowness of the constitutional principle that governs this case and necessitates our remand. . . . In the vast majority of cases, the established hearsay exceptions will continue to govern the admissibility of hearsay evidence at most criminal trials, with this constitutional hearsay exception operating only in the rarest of cases, where otherwise inadmissible evidence is both truly critical to the defendant's case and bears persuasive guarantees of trustworthiness." Id. at 40.

Here, the judge excluded Fay's recorded statement to police on hearsay grounds. She found that the audio-video recorded statement was inadmissible hearsay. She also noted that, as compared to Fay's grand jury testimony, which she allowed to be introduced at trial as prior recorded testimony because Fay was unavailable, the recorded statement did not materially advance the defendant's claim of self-defense. In the recorded statement, Fay said that, after he saw the defendant and the victim facing each other holdings knives, he left and went to a bar.

The defendant concedes that Fay's grand jury testimony, which was read to the jury, "does overlap with much of the Fay [s]tatement." He contends, however, that there are crucial

differences between the recorded statement and the grand jury testimony. "[W]hat the jury would have gotten from the Fay [s]tatement that it did not get from the grand jury testimony [introduced at trial] was the fact that [the victim] was an instigator of violence who was provoking both [the defendant] and Fay to the point where even Fay pushed [the victim] and slammed [the victim]."

We agree with the judge's conclusion that the statement did not fit within the narrow hearsay exception set forth in Drayton. Notably, the defendant did not establish that its admission was critical to his case. By introducing Fay's grand jury testimony, the defendant was able to demonstrate that the victim had been intoxicated and belligerent. The jury heard that the victim pushed one guest to the floor and that almost all of the guests left the gathering because the victim had been so disruptive and was banging on the table. After the others left, the victim continued to pound on the kitchen table with his fists, got into multiple heated arguments, and pushed his friends.[7]

---

[7] There are other differences in Fay's recorded statement as compared to his grand jury testimony. For instance, in his statement, Fay told police that he was so frustrated with the victim that, "[I] finally . . . slammed him. I pushed him. I said, 'Don't -- stop. Go sit down. You know, I'm trying to cook. Go sit down." The victim, chastened, did so. In his grand jury testimony, Fay did not mention that he "slammed" the

In addition, Fay's statement did not bear "persuasive assurances of trustworthiness" (citation omitted).  See <u>Drayton</u>, 473 Mass. at 36.  Fay told the police that he left the trailer as soon as he saw the victim and the defendant holding knives. By contrast, Fay testified before the grand jury that he was present during the knife fight and saw the victim collapse onto the kitchen floor, upon which Fay left the trailer.  Fay also testified at the grand jury that he had lied to the police in his initial statement.  He explained that, at the time of the recorded statement, "I was basically scared to death.  I mean, I didn't want to get hemmed up in something that I had nothing to do with and had no control of.  We're all friends, and it was just a -- nutty situation.  And at that point I was in shock, and what I saw I never saw before in my life.  And that was it.

---

victim, or that he ordered the victim to sit down.  These facts, and some other differences in Fay's description of the events, were not material to the defendant's claim of self-defense.

The defendant makes much of the fact that the judge issued her ruling based on a transcript of Fay's statement, without viewing the audio-video recording.  We have watched the recording and conclude that the video portion of the interview did not add any substantive evidence.  The recording does show that Fay spoke using many gestures, and demonstrated parts of the altercation, such as the victim pounding on the table; Fay also made pushing motions to indicate the victim pushing others. Fay insisted that he left the trailer as soon as the victim and the defendant armed themselves, and that he did not see the knife fight.  As such, Fay did not reenact the stabbing.

I just, I wasn't right in my mind at that point."[8]  See

Commonwealth v. Dame, 473 Mass. 524, 533 n.17, cert. denied, 137

S. Ct. 132 (2016) (rejecting defendant's claim that Drayton

exception applied where excluded statements were contradicted by

other evidence).

For these reasons, we conclude that the judge did not err

in excluding Fay's recorded statement from being introduced in

evidence.

b.  Adjutant evidence.  In Adjutant, 443 Mass. at 650, 664,

we modified our common law of evidence and decided that, in a

case involving a claim of self-defense where the identity of the

initial aggressor is in dispute, a defendant may introduce

evidence of specific prior acts of violence that had been

initiated by the victim.  See Mass. G. Evid. § 404(a)(2)(B)

(2018).  Departing from our prior case law, see Commonwealth v.

Fontes, 396 Mass. 733, 735-736 (1986), we held that this

evidence is admissible whether or not the victim's prior acts of

violence were known to the defendant.  Adjutant, supra at 649-

650.  The purpose of so-called Adjutant evidence "is to give the

_____

[8] Over the defendant's objection, the judge allowed the Commonwealth to impeach Fay's grand jury testimony with portions of the audio-video recording.  Thus, the jury heard that, on a prior occasion, Fay had told the police that he left the trailer before the stabbing, and did not see a knife fight.  This evidence was admissible to impeach the credibility of a hearsay declarant.  See Commonwealth v. Mahar, 430 Mass. 643, 649 (2000); Mass. G. Evid. § 806 (2018).

jury a full picture of the altercation so as to make an informed decision about the identity of the initial aggressor." Commonwealth v. Pring-Wilson, 448 Mass. 718, 737 (2007). See Commonwealth v. Morales, 464 Mass. 302, 307 (2013) (noting that self-defense cases often involve "confusing and conflicting evidence of what actually happened and a dispute about the identity of the first aggressor").

Subsequently, we clarified that the term "first aggressor" is not limited to the person who provokes or initiates a nondeadly assault. See Commonwealth v. Chambers, 465 Mass. 520, 528-530 (2013). Adjutant evidence is relevant to the issue which person initiated the hostilities, and also as to which person escalated the potential for violence through the use or threat of deadly force. See id. at 529-530. Where either fact is at issue, a defendant may introduce Adjutant evidence to assist the jury in deciding whether the Commonwealth has proved that the defendant did not act in self-defense. Id. at 530.

A trial judge plays a critical role in evaluating proffered Adjutant evidence and allowing the admission of "so much of that evidence as is noncumulative and relevant to the defendant's self-defense claim." Adjutant, 443 Mass. at 663. See Pring-Wilson, 448 Mass. at 738 (admissibility of Adjutant evidence left to sound discretion of trial judge). Accordingly, we do not disturb a judge's finding on the admissibility of Adjutant

evidence unless the finding results from "a clear error of judgment in weighing the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives" (citation and quotation omitted).  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Here, in support of his argument that he was forced to stab the victim in self-defense, the defendant filed a motion in limine seeking to admit four prior acts of violence committed by the victim.  The four specific acts were (1) the victim's 2009 admission to sufficient facts to charges of assault and battery; (2) a 2010 violation of a restraining order; (3) the victim's guilty plea to charges of assault and battery; and (4) a 2001 burglary conviction.  In addition, the defendant moved to introduce Fay's audio-video recorded statement also for this second purpose, as Adjutant evidence.  He argued that, "[d]uring this interview just a few hours after the fatal stabbing, Fay [told] the police that [the victim] was drunk on vodka, started pounding the table with his fists, pushed Fay and repeatedly got into a shoving match with the defendant right before the fatal knife fight."  The Commonwealth objected to the admission of the proffered Adjutant evidence on the ground that certain of the incidents were too remote, and others failed to establish that the victim had been the first aggressor.

The judge allowed the defendant's motion to introduce evidence of the victim's 2009 admission to sufficient facts to a charge of assault and battery. In that case, as described in a police report, the victim approached his former girl friend at the restaurant where she worked and slapped her face with the back of his hand. A few minutes later, the victim assaulted her with a knife that he had grabbed from the restaurant kitchen, and threatened to "snap" her neck.

Over the Commonwealth's objection, the judge ruled that the defendant would be able to introduce a certified copy of the admission to sufficient facts. The judge did not allow the defendant to introduce the police report, reasoning that it was inadmissible hearsay and that, in any event, the defendant had the opportunity to introduce this evidence through the testimony of the victim's former girl friend and the court records. When defense counsel argued that calling the former girl friend would be infeasible because she had been hostile and uncooperative with counsel and his investigator, the judge commented, "Just because she's uncooperative with you, doesn't mean you still can't call her to the stand and put her under oath and ask her about that incident." The judge denied the defendant's motion as to the other proffered Adjutant evidence. She found that the violation of the restraining order was not probative of the victim's aggression and use of a deadly weapon. With respect to

Fay's recorded statement, the judge found that it did not qualify as Adjutant evidence because it did not establish that the victim had been the first to use deadly force.

At trial, the defendant decided to forgo introducing Adjutant evidence. Defense counsel noted, "I don't feel that the Adjutant is powerful with just the one witness, although the [c]ourt disagrees." On appeal, the defendant contends that the judge abused her discretion in her rulings on the admissibility of the proffered Adjutant evidence. He argues that it was error to exclude the audio-video recording of Fay's statement to police because the statement showed that the victim initiated the aggression "close in time to the introduction of deadly force." The defendant argues also that the judge erred in excluding the police report on hearsay grounds and in excluding the victim's violation of the restraining order issued regarding his former girl friend.[9]

---

[9] The defendant also claims that the judge erred by "threatening" to allow the Commonwealth to introduce Adjutant rebuttal evidence. Prior to trial, the Commonwealth moved to introduce evidence that, in 2005, the defendant had been the first aggressor in a barroom brawl with an off-duty fire fighter. See Commonwealth v. Morales, 464 Mass. 302, 310-311 (2013); Mass. G. Evid. § 404(a)(2)(B) (2018). The judge ruled that if the defendant chose to introduce Adjutant evidence, she would conduct a voir dire of the fire fighter to determine whether the defendant had been the first aggressor in that fight. Who had been the first aggressor in that incident was a disputed issue at the trial in the case, because the Commonwealth also had charged the fire fighter with a crime, and

We first consider the argument that the judge's exclusion of the audio-video recording of Fay's statement to police deprived the defendant of the right to introduce admissible evidence that the victim had been the first aggressor. The defendant maintains that the statement included "compelling evidence on the question of who initiated the assault." According to the defendant, this "compelling" evidence consisted of the victim's intoxication, the victim acting aggressively by pounding on the kitchen table and starting a fight with the defendant, and the victim pushing Fay.

Contrary to the defendant's claim, however, he was in fact able to, and did, present this evidence to the jury in the form of Fay's testimony to the grand jury, which was read in evidence in a question and answer form, as it had been given. Fay's testimony, through the grand jury transcript, included his statement that the victim had been drinking vodka and sniffing cocaine.[10] Fay described the victim as "drunk" and "disruptive."

_____

the fire fighter admitted to sufficient facts. In making this ruling, the judge noted that the defendant had changed his position on whether he intended to introduce Adjutant evidence at trial. She requested that defense counsel discuss with the defendant the strategic choice of going forward with the Adjutant evidence and consider the possibility of rebuttal evidence if he chose to do so. This was not a "threat."

[10] This testimony was corroborated by the medical evidence. The medical examiner testified that the victim's blood alcohol

Fay testified that that the victim, in an intoxicated state, had pushed Fay and another guest without provocation.  Fay also testified that the victim had been continuously pounding the kitchen table and that he had fought with the defendant.  Fay stated that he had been forced to separate the victim and the defendant three or four times because the victim and the defendant "were arguing back and forth, and they got into a few pushing contests."[11]  Thus, there was no abuse of discretion in the judge's decision not to allow the introduction of the audio-video recording of Fay's earlier statement, which the judge determined to be hearsay.

We turn to the police report in the 2009 case of assault and battery, in which the victim admitted to sufficient facts. The judge excluded the police report as inadmissible hearsay. As stated, in Adjutant, 443 Mass. at 664, we concluded that, in

---

content was .10, and that the toxicology screen was positive for cocaine.

[11] During a hearing on the defendant's motion, trial counsel agreed that Fay's grand jury testimony included the Adjutant evidence contained in the audio-video recording of Fay's statement to police.

> The judge:  "And I believe [the Adjutant evidence] has to do with the portion of the recorded interview of Mr. Fay dealing with the allegations that [the victim] was drunk, started pounding on the table with his fist, pushed Mr. Fay, and repeatedly got into a shoving match.  It's my understanding that that testimony is in Mr. Fay's grand jury testimony.  Is that correct . . . ?"
>
> Defense counsel:  "Yes."

a case involving a claim of self-defense, where the identity of the first aggressor is disputed, a defendant may introduce evidence of specific acts of violence by the victim to demonstrate that the victim had been the first aggressor.  The decision did not, however, "alter the rule against the admission of hearsay evidence."  See Commonwealth v. Clemente, 452 Mass. 295, 306 & n.18 (2008), cert. denied, 555 U.S. 1181 (2009) (police reports detailing specific incidents of violence were inadmissible).  "The case merely permitted the admission of evidence that previously had been deemed irrelevant."  Id. at 306 n.18.

We do not agree with the defendant's argument that Clemente has been abrogated by the court's holding in Drayton.  As discussed, in that case we carved out a narrow exception for the "rarest" of cases "where otherwise inadmissible evidence is both truly critical to the defense's case and bears persuasive guarantees of trustworthiness."  Drayton, 473 Mass. at 40. Here, by contrast, the police report was not critical to the defense because the victim's former girl friend, although apparently hostile to defense counsel, was available to testify to the incident of assault and battery.

Finally, we discern no error in the judge's decision not to allow introduction of the victim's violation of the restraining order.  In April, 2010, the victim repeatedly telephoned his

former girl friend in violation of a protective order not to have any contact with her. During one of those telephone calls, the victim asked his former girl friend, "What's going on -- Are you going to [c]ourt? . . . Are you trying to lock me up?" In another telephone call, the former girl friend asked the victim, "What do you want from me?" The victim replied, "I want your blood." Relying on Commonwealth v. Gaynor, 73 Mass. App. Ct. 71, 75-76 (2008), the judge found that the violation of the restraining order did not qualify as an incident of specific violence admissible to prove that the victim had been the first aggressor. The violation of the restraining order was different in nature from the knife fight. See id. The victim's threats to his former girl friend were made by telephone, and there was no indication that the victim followed through on those threats. On this evidence, the judge did not abuse her discretion in finding that the violation of the restraining order did not tend to show that the victim was the initial aggressor in this incident.

c. Recusal. Six years prior to this trial, defense counsel was counsel for a different defendant in an unrelated murder case before the same judge. The judge found defense counsel in contempt of court. Although the defendant did not seek the judge's recusal at trial, on appeal, the defendant raises the question whether the judge's failure to consider

recusal sua sponte deprived him of the right to trial before an impartial tribunal. Because the defendant did not ask the judge to recuse herself prior to or during trial, we consider this claim to determine whether there was a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992), S.C., 469 Mass. 447 (2014).

The issue requires us to examine the judge's prior decision to hold defense counsel in civil contempt. During the course of a 2010 trial, the judge found that counsel had behaved "like a five year old" and "in the most unprofessional, unethical manner that [she had] ever witnessed . . . in [her] nineteen years on the bench." At the end of the trial, the judge conducted a contempt hearing and found, among other things, that defense counsel had made repeated, loud outbursts at sidebar; had acted "absolutely out of control"; had displayed a lack of respect and disdain for the court and the court's rulings; and had called the prosecutor "jackass" in a voice loud enough to be heard by the jury. The judge held counsel in contempt for violating Mass. R. Prof. C. 3.4, 426 Mass. 1389 (1998) (fairness to opposing party and counsel), and Mass. R. Prof. C. 3.5, 426 Mass. 1391 (1998) (decorum of tribunal). She commented that he was a zealous advocate but had stepped far over the line; accordingly, she fined him $500. The judge noted, however, that

counsel's actions had not been undertaken with a malicious intent and, therefore, she would not report him to bar counsel.

The defendant maintains that, based on this prior finding, the judge was required sua sponte to consider the issue of recusal.  Supreme Judicial Court Rule 3:09, Canon 2, Rule 2.11 (A) (2016), provides that a judge shall "disqualify himself or herself in any proceeding in which the judge cannot be impartial or the judge's impartiality might reasonably be questioned."  The duty to disqualify includes circumstances where "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer."  Id.  "The touchstone for the principle of judicial impartiality are the words memorialized in art. 29 of the Massachusetts Declaration of Rights, requiring that judges be "as free, impartial and independent as the lot of humanity will admit" (citation omitted).  Commonwealth v. Eddington, 71 Mass. App. Ct. 138, 142-143 (2008).  See Commonwealth v. Leventhal, 364 Mass. 718, 721 (1974) (rigid adherence to principles embodied in art. 29 "is essential to the maintenance of free institutions" [citation omitted]).

We have held that bias requiring removal "ordinarily arise[s] from an extrajudicial source."  Commonwealth v. Gogan, 389 Mass. 255, 259 (1983).  A judicial ruling, standing alone, "almost never constitute[s] a valid basis for a bias or partiality motion."  Liteky v. United States, 510 U.S. 540, 555

(1994). See Erickson v. Commonwealth, 462 Mass. 1006, 1007 (2012) (recusal not required where defendant was unable to demonstrate that judge's rulings were "influenced by any considerations other than the law" [citation omitted]). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Liteky, supra. See LoCascio v. United States, 473 F.3d 493, 495-496 (2d Cir.), cert. denied, 552 U.S. 1010 (2007) (trial judge's decision to hold defense counsel in contempt and his fourteen-year history of denying defendant's motions "do not raise even a suspicion of a 'deep-seated and unequivocal antagonism that would render fair judgment impossible'" [citation omitted]).

The defendant contends that the judge in his case "displayed an improper judicial temperament and a clear bias toward counsel in front of [the] jury." He maintains that she exhibited bias against defense counsel by repeatedly criticizing

and scolding him, raising her voice,[12] admonishing counsel in front of the jury, and declining to provide counsel with the opportunity to be heard.

There is no need to discuss every exchange between the judge and defense counsel over the course of the defendant's trial. It suffices to say that, on multiple occasions, defense counsel raised issues that previously had been fully argued and decided by the judge. The judge was required to admonish him to stop interrupting her and to keep his voice down at sidebar conferences so that he would not be overheard by the jury. After one sidebar conference towards the end of the trial, the judge commented that defense counsel was acting unprofessionally and was "absolutely out of control."

Notwithstanding counsel's persistence in continuing this type of behavior, the judge admonished him before the jury on a single occasion. During cross-examination of a police officer, defense counsel sought to inquire into the reason why the

---

[12] The defendant provided this court with the audio recordings of the trial. Based upon our thorough review of those recordings, including all of the instances in which the defendant claims that the judge "yelled" at defense counsel, we are not persuaded that the record evinces bias against defense counsel. The few isolated exchanges, when viewed in context, show that counsel repeatedly questioned and rejected the judge's rulings, at many points talking over her. Although clearly frustrated by defense counsel's conduct, the judge took great care to explain the legal basis for her rulings and displayed appropriate judicial demeanor while maintaining control of the trial.

defendant was hostile toward members of the Revere fire department. The judge sustained the prosecutor's objection to this line of questioning. Ignoring the judge's ruling on the objection, as well as the judge's request to see the parties at sidebar, defense counsel twice repeated the prohibited question. The judge instructed defense counsel in open court, "When there is an objection, you stop. Please, you know better than that."

It is well established that "a trial judge is responsible for controlling the trial, maintaining order in the courtroom, and guarding against improper conduct of counsel." Commonwealth v. Perez, 390 Mass. 308, 316 (1983). After carefully considering the record, we discern no evidence of "deep-seated favoritism or antagonism that would make fair judgment impossible." See Liteky, 510 U.S. at 555; Erickson, 462 Mass. at 1007. The judge remained as respectful as possible to defense counsel while fulfilling her obligation to control the trial and to maintain order in her court room. See Commonwealth v. Imbert, 479 Mass. 575, 588 (2018) (judge sometimes required to admonish counsel to maintain order).

Our conclusion is supported by the judge's careful instructions to the jury that were intended to mitigate any potential prejudice that may have resulted from the jury's perception that the judge viewed defense counsel as having been out of line. The judge twice instructed the jury to "applaud"

the lawyers for acting as "zealous advocates." She explained further that the jury should not infer anything from her rulings on objections or motions, or from her comments to the lawyers. See Imbert, 479 Mass. at 588; Commonwealth v. Carter, 475 Mass. 512, 526 (2016). In sum, we discern no evidence of bias and no reason that the judge should have, sua sponte, considered recusing herself.

d. Jury question. The defendant argues that the judge committed reversible error when she provided supplemental instructions to the jury in response to a question concerning self-defense. During deliberations, the jury posed the following question:

"Dear Judge, If we find that the sole basis self-defense is not available to the defendant is his use of excessive force (reason #4 on pg. 20 of your instructions), are we limited to a conviction of voluntary manslaughter due to mitigating circumstances? Or, are First & Second degree murder convictions still possible if we find that the other elements of those crimes are satisfied by the facts proven beyond a reasonable doubt?"[13]

Defense counsel requested that the judge instruct the jury that, if they found that the defendant had used excessive force in

---

[13] "[R]eason #4 on pg. 20 of [the judge's written] instructions" refers to that section of the judge's written final charge which listed the five ways in which the Commonwealth could establish the absence of the proper use of self-defense. See Model Jury Instructions on Homicide 20-21 (2013). See also Commonwealth v. Glacken, 451 Mass. 163, 166-167 (2008). The fourth proposition stated: "4. The defendant used more force than was reasonably necessary under all the circumstances."

self-defense, they would be limited to a verdict of voluntary manslaughter.  The judge determined that the question called for a broader explanation of self-defense, because the jury's note conflated the defense of self-defense with the mitigating factor of excessive use of force in self-defense.  See Commonwealth v. Santos, 454 Mass. 770, 780 (2009) (Gants, J., dissenting) ("The defense of self-defense is related to, but separate and distinct from, the mitigating factor of excessive use of force in self-defense").  See also Commonwealth v. Allen, 474 Mass. 162, 172 (2016) ("the use of excessive force . . . does not cause the defendant to lose the benefit of the defense entirely . . . but instead may warrant a finding of manslaughter" [citation omitted]).

Over the defendant's objection, the judge instructed:

"If you find that the Commonwealth has proved beyond a reasonable doubt that the defendant used more force than was reasonably necessary under the circumstances, then the defense of self-defense is not available to the defendant, and you may not acquit him on the basis of such a defense.

"You may convict the defendant of either first or second degree murder if the Commonwealth has proven to you beyond a reasonable doubt, in addition to all the other elements of either first or second degree murder, that there were no mitigating circumstances, including but not limited to the excessive use of force in self-defense."

On appeal, the defendant acknowledges that the jury's question was ambiguous.  Nonetheless, the defendant asserts that the proper answer to the jury's question should have been a

simple "no." That is, a conviction of murder is not possible if the jury were to find that the defendant used excessive force in self-defense. Relying on Commonwealth v. Tavares, 471 Mass. 430 (2015), the defendant contends that the effect of the supplemental instructions was to obscure or eliminate the possibility that he could be found guilty of voluntary manslaughter.

Unlike the instructions in Tavares, however, the instruction here accurately stated the law. The complete defense of self-defense is not available to an individual who uses excessive force. See Commonwealth v. Glacken, 451 Mass. 163, 167 (2008). It is the Commonwealth's burden to prove that there were no mitigating circumstances that would reduce the crime from murder to manslaughter. Commonwealth v. Torres, 420 Mass. 479, 485 (1995).

Moreover, in her final charge before the jury began deliberations, the judge provided the jury with comprehensive instructions concerning the possibility of a verdict of voluntary manslaughter based on the excessive force in self-defense. See Commonwealth v. Harris, 395 Mass. 296, 301 (1985) (supplemental instructions considered in light of entire set of instructions). The judge informed the jury that, "[i]f you do not find the defendant guilty of murder in the first-degree or murder in the second-degree, you shall consider whether the

Commonwealth has proved the defendant guilty beyond a reasonable doubt of the lesser offense of voluntary manslaughter."  In concluding her instructions on the elements of murder, she explained, "[I]n addition to these elements, the Commonwealth must also prove that there were no mitigating circumstances."  A mitigating circumstance, the judge instructed, "is a circumstance that reduces the seriousness of the offense in the eyes of the law.  A killing that would be murder in first or second degree is reduced to the lesser offense of voluntary manslaughter where the Commonwealth has failed to prove that there were no mitigating circumstances."  See Model Jury Instructions on Homicide 36, 41-42 (2013).

The judge also properly instructed the jury on the lesser included offense of voluntary manslaughter based on excessive use of force in self-defense.  She explained, "I have already told you that to prove the defendant guilty of murder, the Commonwealth is required to prove beyond a reasonable doubt that the defendant did not act in the proper exercise of self-defense.  If the Commonwealth proves that the defendant did not act [in] proper self-defense solely because the defendant used more force than was reasonably necessary, then the Commonwealth has not proved that the defendant committed the crime of murder. But if the Commonwealth has proved the other required elements,

you shall find the defendant guilty of voluntary manslaughter."
See Model Jury Instructions on Homicide, supra at 71.

Because the supplemental instructions, viewed in light of the entire charge, did not eliminate or reduce the possibility of a verdict of voluntary manslaughter based on the excessive use of force in self-defense, there was no error.

e. Relief pursuant to G. L. c. 278, § 33E. The defendant asks the court to consider all of the claims of error, taken as a whole, and to come to the conclusion that justice was not done. In particular, the defendant argues that he is entitled to relief under G. L. c. 278, § 33E, because he was tried by a judge who failed to safeguard his rights, and was represented by a lawyer who antagonized the judge.

As discussed, we do not agree with the defendant's contention that he was deprived of a fair trial because of animus between the judge and defense counsel, and therefore decline to disturb the verdict on that basis.

Pursuant to our duty under G. L. c. 278, § 33E, we have carefully examined the entire record to determine whether relief should be granted on some other ground. We have considered the evidence of self-defense and sudden combat that the defendant emphasizes, including the senseless nature of the fight, evidence of both the victim's and the defendant's levels of intoxication, and the fact that the victim was armed with a

knife.  We also have considered evidence that the defendant and the victim had been arguing and fighting earlier, and that they had been separated a number of times because of that.  In addition, we have considered evidence that, although Fay gave inconsistent statements concerning what he saw of the fight, in one of those statements, Fay said that he saw the smaller victim "fighting for his life" and being overpowered by the larger and stronger defendant.

Having carefully reviewed the record, we conclude that the defendant is not entitled to relief under G. L. c. 278, § 33E. The issue of self-defense, which was the central theory of defense, was fully aired at trial.  Furthermore, based upon the nature, number, and severity of the victim's wounds, we discern no reason to disturb the jury's verdict that the offense was murder in the first degree, not murder in the second degree or manslaughter, nor was it a killing in self-defense.  The record does not suggest a fight between two equally matched combatants or that the defendant was overpowered and had no other means by which to escape an onslaught from the victim.  The victim, who was approximately four inches shorter and sixty pounds lighter than the defendant, sustained three stab wounds, any one of which could have been fatal, in addition to more than sixty other knife wounds.  The defendant sustained a single cut on the back of one leg.

"The search under [G. L. c. 278, § 33E,] is a more general and an obligatory one for a result that may be 'more consonant with justice,'" Commonwealth v. Davis, 380 Mass. 1, 15 n.20 (1980), quoting Commonwealth v. Seit, 373 Mass. 83, 94 (1977), but "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." Commonwealth v. Reddick, 372 Mass. 460, 464 (1977).  See Commonwealth v. Walker, 443 Mass. 213, 229 (2005).  In light of the entirety of the record, we discern no reason to set aside the verdict or to reduce the degree of guilt.  See Commonwealth v. Harris, 464 Mass. 425, 429-430, 436 (2013) (court declined to exercise its extraordinary authority to set aside murder verdict despite evidence that victim had reached for firearm, had threatened to shoot defendant, and had grabbed defendant by throat).  Contrast Commonwealth v. Vargas, 475 Mass. 338, 365-367 (2016) (verdict of voluntary manslaughter more consonant with justice where defendant was fearful of victim, "who was much larger" and was "trained to kill," and where fight was result of "uncontrolled violent actions on the part of the defendant").

Having carefully considered all of the evidence, we discern no reason to use our authority under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt.

Judgment affirmed.