NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13357

COMMONWEALTH  vs.  JEFFREY SOUZA.


Bristol.     April 5, 2023. - August 14, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Homicide.  Firearms.  Assault and Battery by Means of a
    Dangerous Weapon.  Self-Defense.  Evidence, Self-defense,
    Prior violent conduct.  Practice, Criminal, Instructions to
    jury, Argument by prosecutor, Assistance of counsel.



    Indictments found and returned in the Superior Court
Department on March 5, 2015.

    The cases were tried before E. Susan Garsh, J.; a motion
for postconviction relief, filed on December 26, 2019, was
considered by Thomas J. Perrino, J., and a motion for
reconsideration was also considered by him.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Matthew V. Soares for the defendant.
    Stephen C. Nadeau, Jr., Assistant District Attorney, for
the Commonwealth.


    LOWY, J.  During a physical altercation, the defendant,

Jeffrey Souza, shot and killed Kyle Brady, the victim.

Thereafter, a Superior Court jury convicted the defendant of murder in the second degree, assault and battery by discharge of a firearm, unlawful possession of a firearm, and unlawful possession of a loaded firearm. At trial, the defendant's theory was that he killed the victim in lawful self-defense.[1] In support of that theory, the defendant sought to introduce so-called Adjutant evidence or "evidence of specific incidents of violence allegedly initiated by the victim." Mass. G. Evid. § 404(a)(2)(B) (2023). See Commonwealth v. Adjutant, 443 Mass. 649 (2005). The trial judge allowed the defendant to introduce evidence of numerous violent incidents initiated by the victim. However, the judge limited the testimony about these incidents to evidence of the victim instigating violence and barred additional testimony describing the entire violent event. On appeal, among other issues, the defendant contends that the judge committed an error of law in misconstruing our Adjutant jurisprudence by limiting such evidence to the victim's first act of violence, rather than allowing evidence of the entire violent interaction. He further argues error in the judge's instructions limiting the jury's consideration of the admitted Adjutant evidence only as to who attacked whom first in the

_____

[1] The defendant also suggested that the shooting was an accident. He raises no issue pertaining to that claim on appeal.

altercation.  Therefore, we address when specific incidents of violence may be admitted in evidence pursuant to Adjutant and its progeny, including Commonwealth v. Chambers, 465 Mass. 520 (2013), the scope of such evidence, and the permissible purposes for which a fact finder may consider such evidence.

We take this opportunity to reiterate that Adjutant evidence is one of the few narrow exceptions to the general bar on propensity evidence.  In a case involving a claim of self-defense, evidence of specific acts of violence initiated by the victim under Adjutant are admissible in two specific circumstances:  (1) as to the identity of the first aggressor when the first aggressor is disputed; and (2) "as to which person [in a confrontation] escalated the potential for violence through the use or threat of deadly force."  Commonwealth v. Deconinck, 480 Mass. 254, 263 (2018).  We emphasize that Adjutant evidence is admissible only when one or both of the following issues are in dispute:  to determine (1) who started the confrontation; or (2) who escalated the confrontation by using or threatening to use deadly force.

We further emphasize that Adjutant evidence is not strictly limited to evidence of the victim initiating violence or throwing the first punch.  Rather, when the question of who started the fight or who was the first to introduce deadly force is at issue as part of a defendant's claim of self-defense,

evidence of the entire violent incident initiated by the victim is potentially admissible to give the jury a full picture, thus allowing them to make an informed decision in determining who the first aggressor was.  Deconinck, 480 Mass. at 263.  The admissibility of this evidence is always subject to the broad discretion afforded to the trial judge "in evaluating . . . and allowing the admission of 'so much of that evidence as is noncumulative and relevant to the defendant's self-defense claim.'"  Id., quoting Adjutant, 443 Mass. at 663.

Here, as we shall explain, the trial judge curtailed the examination of numerous witnesses testifying about violent instances initiated by the victim by limiting the testimony to the victim's initiation of violence.  The judge's ruling excluding the additional testimony about the violent interactions demonstrates her belief that the objected-to testimony exceeded both the scope and the purpose of Adjutant evidence.  As such, the judge committed an error of law in ruling on this evidence.  See Commonwealth v. Guilfoyle, 396 Mass. 1003, 1004 (1985).  However, we ultimately discern no prejudice from its exclusion.  We also discern no error in the judge's jury instruction regarding the jury's consideration of Adjutant evidence.

We acknowledge, however, that the jury instruction regarding Adjutant evidence contained within the Model Jury

Instructions on Homicide 34 & nn.81-82 (2018) could more concisely and understandably explain the purpose and admissibility of Adjutant evidence. We accordingly provide an Appendix containing a model jury instruction regarding the use of Adjutant evidence that is approved and recommended by this court.

The defendant's other claims of error regarding improper closing argument and ineffective assistance of counsel provide no basis for relief. We affirm the defendant's convictions of murder in the second degree and assault and battery by means of discharging a firearm and the orders denying his motions for a new trial and for reconsideration. However, pursuant to our decision in Commonwealth v. Guardado, 491 Mass. 666, 690, 693 (2023), we vacate the defendant's convictions of carrying a firearm without a license and carrying a loaded firearm without a license.

Background. The defendant's convictions stem from a fight and subsequent shooting that occurred near a park in Fall River during the early morning hours of January 1, 2015, and resulted in the victim's death. Prior to the fatal shooting, there had been a long-standing feud between the victim and the defendant, which centered around Courtney Morrison, who was, when the feud began, the victim's girlfriend but had previously been the defendant's girlfriend and was the mother of the defendant's

children.  Between August 2014 and December 2014, the victim repeatedly sent the defendant threatening messages.  In some of these messages, the victim challenged the defendant to a fight.  The defendant generally ignored the messages or responded by telling the victim to "chill out."

On the evening of December 31, 2014, the defendant and his friends encountered the victim's friend Kyle Emond at a bar in Fall River.  At trial, there was conflicting testimony about this encounter.  Emond testified that he heard the defendant say that "he had something for [the victim],", and that Emond should "[t]ell [the victim] to meet [the defendant] at [the park]" in Fall River.  But the defendant testified that he asked Emond to call the victim to make peace because whenever the defendant tried to do so, the victim threatened him.

Ultimately, Emond called Christopher Silvia, who was out that evening with a group of friends, including the victim and the victim's sister, Brittany Brady.[2]  While Emond was talking to Silvia, the victim took Silvia's cell phone and walked away with it.  When the victim returned to Silvia and his group of friends, the victim was "angry" and "didn't look too happy."  The victim told Silvia and his friends that he was leaving to

---

[2] Because Brittany Brady shares a surname with her brother, the victim, we refer to her by her first name to avoid confusion.

meet the defendant "for a fist fight." Brittany told the victim that he was not going to the fight alone. Silvia, Brittany, and the victim got into Silvia's car and drove to the park. At around the same time, Emond and one of his friends drove to the park, while the defendant and some of his friends drove to the park separately.

The fight that resulted in the defendant shooting the victim unfolded very quickly. Various people, in support of both the defendant and the victim, were present near the park, and the jury heard various accounts of how the fight transpired. Undisputed, however, was that during the confrontation the defendant carried a gun, produced it, and fired it. Two gunshots were fired during the fight at an interval of approximately sixteen seconds apart. The defendant testified that during the fight he fired what he characterized as a "warning shot." A silver revolver covered in blood was found at the scene of the victim's death.[3] The medical examiner determined that the victim's cause of death was a single gunshot wound to his chest.

_____

[3] On December 24, 2014, the defendant brought a revolver to a party. The defendant testified that he had a silver revolver with him near the park but that it was not the same one that he had brought to the Christmas Eve party. However, a witness who saw the revolver at the Christmas Eve party testified that the revolver found near the victim's body resembled the revolver that the defendant had at the party.

Because the primary issue on appeal involves Adjutant evidence, the issue of how the fight began is of paramount importance. Witnesses testified to various versions of how the fatal confrontation began.

Under one version of events, when the victim's car arrived at the park, the victim jumped from the car while it was still moving and ran off. The next time that the defendant and victim were seen, they were standing face to face, and one witness heard the victim say something along the lines of, "You're not going to shoot me." After a loud bang, the victim and defendant were seen wrestling each other.

According to a second version of events, after arriving near the park, the victim ran toward the car where the defendant was sitting in the front passenger's seat. The victim opened the car door in an attempt to get at the defendant, but the defendant jumped out of the car, and then both the defendant and the victim ran off.

The defendant testified that he arrived near the park before the victim and decided to leave and have someone else stay to talk to the victim. As the defendant was walking away, someone tackled him from behind. When he got up from the ground, the defendant saw the victim, Emond, Brittany, and Silvia all running toward him. The defendant then pointed the gun in the air and yelled at them to stop. When they did not

stop, he "fire[d] off a warning shot."  Thereafter, undeterred, the group attacked the defendant, and during the struggle the gun went off a second time.

The jury found the defendant guilty of murder in the second degree, assault and battery by means of discharging a firearm, carrying a firearm without a license, and carrying a loaded firearm without a license.  The defendant filed a timely notice of appeal.  In December 2019, the defendant filed a motion for a new trial.  The motion was denied without a hearing by a different judge.[4]  Thereafter, the defendant filed a motion for reconsideration, which was also denied.  The defendant then filed another notice of appeal, and the Appeals Court consolidated the defendant's direct appeal with his appeal from the orders denying his motions for a new trial and reconsideration.  We then transferred the case sua sponte to this court.

Discussion.  Because the issues in this case deal with the admission of character evidence pursuant to Adjutant, 443 Mass. at 663-667, we briefly discuss character or propensity evidence more generally to put the issue in context before specifically addressing the purpose and admissibility of Adjutant evidence.

---

[4] The motion was decided by a different judge as the trial judge had since retired.

"Evidence of a person's bad character is generally not admissible for the purpose of proving that he acted in conformity with it." Commonwealth v. Daley, 439 Mass. 558, 562 (2003). Specific acts of bad conduct may be relevant and admissible for a nonpropensity purpose such as state of mind, intent, knowledge, or modus operandi, but as a general rule evidence of such acts cannot be used for the purpose of establishing the defendant's bad character or propensity to commit the crime charged. Id. at 562-563. Notably, if character evidence is misused "either in the examination of a witness or in closing argument, we have long recognized that instructions from the trial judge may mitigate any prejudice." Id. at 564.

In certain very limited circumstances, the defendant may offer evidence of a pertinent character trait of the victim. See Mass. G. Evid. § 404(a)(2)(B)-(C). The defendant may offer evidence known to the defendant of the victim's reputation for violence to demonstrate, when relevant, the defendant's reasonable apprehension of the victim. See, e.g., Commonwealth v. Fontes, 396 Mass. 733, 735-736 (1986). See also Mass. G. Evid. § 404(a)(2)(C). He or she may also offer, for the same purpose, evidence of specific violent acts by the victim that were previously known to the defendant and evidence of threats to the defendant allegedly made by the victim and communicated

to the defendant by the victim or a third party.  See, e.g., Fontes, supra; Commonwealth v. Edmonds, 365 Mass. 496, 499-500 (1974).  See also Mass. G. Evid. § 404(a)(2)(C).  Often understandably confused with character evidence admissible for propensity purposes, this evidence is not propensity evidence and may not be considered for propensity purposes.  Rather, it is relevant and admissible evidence relating to the defendant's state of mind.  See, e.g., Commonwealth v. Correia, 492 Mass. 220, 227 (2023) ("defendant argued that it was reasonable for him to assume that the victim had a gun at the park because the defendant had seen the victim's social media posts that depicted the victim with a gun").  See also Adjutant, 443 Mass. at 654 ("Massachusetts has long followed the evidentiary rule that permits the introduction of evidence of the victim's violent character . . . as it bears on the defendant's state of mind . . .").

1.  Adjutant evidence.  With this context in mind, we now discuss Adjutant evidence.  "Notwithstanding our usual hesitation to allow the admission of character evidence to prove conduct" in conformity therewith, pursuant to Adjutant, and as subsequently clarified in Chambers, there is a narrow exception to the general prohibition on character or propensity evidence that allows the admission of specific acts of violent conduct by a victim to be admitted in evidence and considered for

propensity purposes.  Adjutant, 443 Mass. at 660.  See Chambers, 465 Mass. at 528-530.  In Adjutant, supra at 664, we held that "where the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense," regardless of whether the defendant knew of the victim's prior violent acts. This evidence "may be admitted as tending to prove that the victim and not the defendant was likely to have been the 'first aggressor'" because it may show "that the victim acted in conformance with his character for violence" on the occasion in question.  Id. at 654.

Subsequently, in Chambers, we clarified "that the term 'first aggressor' is not limited to the person who provokes or initiates" the conflict.  Deconinck, 480 Mass. at 263, citing Chambers, 465 Mass. at 528-530.  Rather, in the context of Adjutant evidence, the term "first aggressor" encompasses both the person who started the fight and the person who first escalated a nondeadly fight into a deadly one by either the threat or use of deadly force.[5]  See Chambers, supra.  See also Deconinck, supra.

---

[5] While not at issue in this case, it is worth noting that if a defendant introduces Adjutant evidence, "the prosecution

"[A]s often occurs [in cases where] self-defense is at issue, there [can be] confusing and conflicting evidence of what actually happened and a dispute about the identity of the first aggressor." Commonwealth v. Morales, 464 Mass. 302, 307 (2013). The purpose of Adjutant evidence "is to give the jury a full picture of the altercation so as to make an informed decision about the identity of the initial aggressor." Deconinck, 480 Mass. at 263, quoting Commonwealth v. Pring-Wilson, 448 Mass. 718, 737 (2007). Our rationale for creating this exception to the general prohibition on propensity evidence "can be found in the view that evidence reflecting the victim's propensity for

---

may rebut by introducing evidence of the victim's propensity for peacefulness." See Mass. G. Evid. § 404(a)(2)(B) note, citing Adjutant, 443 Mass. at 666 n.19. We also held in Commonwealth v. Morales, 464 Mass. 302, 303 (2013), that "where a defendant offers Adjutant evidence, the Commonwealth may offer evidence of the defendant's prior violent acts, provided that the Commonwealth gives the defendant advance notice of its intent to offer such evidence 'and the trial judge determines that,'" Chambers, 465 Mass. at 521 n.1, quoting Morales, supra, "its probative value is [not] outweighed by the risk of unfair prejudice to the defendant," Commonwealth v. Crayton, 470 Mass. 228, 249 & n.27 (2014) (clarifying standard for determining admissibility of bad act evidence). See Commonwealth v. Moore, 480 Mass. 799, 809 n.9 (2018).

"Our case law has not always been consistent regarding the [applicable] standard[s] for excluding evidence." Moore, supra. In Crayton, supra, we clarified that the "more exacting standard" of admissibility applies to bad act evidence. We acknowledge that such an inconsistency appeared in Chambers where we discussed the Commonwealth's ability to rebut the defendant's Adjutant evidence with evidence of the defendant's bad acts. See Chambers, 465 Mass. at 521 n.1.

violence has substantial probative value and will help the jury identify the first aggressor [or the first to initiate or threaten deadly violence] when the circumstances of the altercation are in dispute." Adjutant, 443 Mass. at 656. "Whether [the victim] was a violent [person], prone to aggression . . . , 'throws light' on the crucial question at the heart of" such cases -- who attacked whom first or who escalated the situation to one involving deadly force. Id. at 657-658, quoting Commonwealth v. Woods, 414 Mass. 343, 356, cert. denied, 510 U.S. 815 (1993). And "[t]o decide what really occurred the jury need[] all the available facts, including evidence of [the victim's prior violence]." Adjutant, supra at 659, quoting People v. Lynch, 104 Ill. 2d 194, 200 (1984).

We recognize that because Adjutant evidence is propensity evidence "admitted expressly 'for the purpose of showing that the victim acted in conformance with his [or her] character for violence,' . . . there [is] a risk both of prejudice and of misunderstanding on the jury's part as to the purpose of its admission." Morales, 464 Mass. at 307, quoting Adjutant, 443 Mass. at 654. It is the trial judge's role to take action to mitigate such risks. See Commonwealth v. Kapaia, 490 Mass. 787, 798 (2022), quoting Commonwealth v. Rollings, 354 Mass. 630, 638 (1968) ("The parties are entitled to have a jury appropriately guided at all stages by the trial judge, whose proper

participation is essential to fair trial by jury").  Indeed, "[i]t is the judge's function to act as the 'guiding spirit and controlling mind at a trial,'" Kapaia, supra, quoting Commonwealth v. Rivera, 441 Mass. 358, 368 (2004), and in that guiding role, "[i]t is for the trial judge to evaluate the proffered [Adjutant] evidence's probative value and admit so much of that evidence as is noncumulative and relevant to the defendant's self-defense claim," Adjutant, supra at 663.  The judge's discretion "to exclude marginally relevant or grossly prejudicial evidence" is important, as it "prevent[s] the undue exploration of collateral issues."  See id.  Moreover, it is incumbent on the trial judge to use adequate jury instructions to further mitigate prejudice and confusion "by delineating the precise purpose for which the [Adjutant] evidence is offered." Id. at 664.

a. Adjutant evidence in this case.  In light of the foregoing principles, we turn to the specifics of this case. The Adjutant evidence in this case included testimony by police officers regarding multiple instances in which the victim started a fight at a restaurant or bar, ultimately resulting in him fighting with police officers.  During testimony of two of the officers, after defense counsel elicited testimony about how the violent incidents began, the prosecutor objected to further questions about how the confrontation continued.

Specifically, after the prosecutor's initial objections during the first officer's testimony, the parties had the following conversation at sidebar:

The judge:  "It seems to me you have established that was the first occasion with violence with this individual, that he kicked him.  Anything further I don't see as --"

Defense counsel:  "There's, I guess, what's the relevancy of anything once you have established that he was a violent individual who kicked out and specific acts of violence, that he kicked -- this person approached him, he kicked at him or someone -- at him."

The judge:  "But --"

Defense counsel:  "Well, the relevancy is that [the victim] is not an individual who stops, it takes a lot to subdue him.  I think that's important."

The judge:  "That's not Adjutant, that's --"

The prosecutor:  "It's well beyond the scope, I would say, Judge."

The judge:  "Prior conduct showing a propensity, that's not Adjutant.  Adjutant you get to show that someone was the first to act in a violent manner toward someone else.  You have done that.  What they did afterwards, I don't think it's beyond -- that is creating trials within trials.  It's polluting the trial."

After defense counsel elicited from the second police officer that the victim started another physical fight, the prosecutor objected, and the following exchange occurred at sidebar:

The judge:  "What do you anticipate the response to be?"

Defense counsel:  "I think the response is going to be that he wrestled with him, then he had ta[s]ed him a couple of times to stop him from kicking.  That's important."

The prosecutor:  "Again, Judge, same objection as previously, this doesn't go to Adjutant at this point."

The judge:  "I'll sustain the objection."

The defendant contends that the officers should have been allowed to continue their testimony and explain the full scope of each violent incident initiated by the victim.  Based on police reports about these incidents, the defendant contends that the first officer would have explained that the victim's violence did not stop after the victim was handcuffed.  Rather, it continued while he was being transported to the police station, and persisted even after he arrived at the police station.  The defendant explains that the second officer would have testified that the victim's violence was so severe that the officer needed to tase the victim multiple times in order to subdue him.  The defendant argues that this testimony concerning the entirety of the violent incidents was admissible and consistent with the purposes of Adjutant because it demonstrated the victim's propensity for violence and, specifically, that the victim was prone to initiate violence and that, when he did so, he was unrelenting and would inevitably continue even when presented with lawful opposition.  The defendant contends that, in ruling this evidence inadmissible, the judge's statements demonstrate that she believed Adjutant evidence was strictly limited to evidence of the victim initiating violence, rather

than the whole violent incident.  By contrast, the Commonwealth argues that the judge merely exercised her discretion under Adjutant to exclude the remainder of the evidence after considering its probative value and prejudicial effect.

We take this opportunity to emphasize that Adjutant evidence is not strictly limited to testimony that the victim initiated a violent incident or started a fight.  In cases involving a claim of self-defense, where the identity of the first aggressor is in dispute, trial judges have discretion to admit in evidence "specific incidents of violence," Adjutant, 443 Mass. at 650, or put another way, "specific acts of prior violent conduct," Morales, 464 Mass. at 307, that the victim is reasonably alleged to have initiated.  See, e.g., Deconinck, 480 Mass. at 263-264; Chambers, 465 Mass. at 529-531; Adjutant, supra at 650, 664.  While we have referred to both prior "acts" and "specific incidents" to describe this evidence, our case law has always maintained that the focus is on the victim's prior violent behavior.  See, e.g., Adjutant, supra at 650 ("we are persuaded that evidence of a victim's prior violent conduct may be probative of whether the victim was the first aggressor").  Nothing in our jurisprudence has limited this evidence to only the victim's initial act.  Such a limitation would be contrary to the primary purpose of Adjutant evidence:  providing the jury with a "full picture" including propensity evidence, so that the

jury may "make an informed decision about the identity of the initial aggressor." Deconinck, supra at 263, quoting Pring-Wilson, 448 Mass. at 737. See Adjutant, supra at 658-659. Where a defendant seeks to introduce Adjutant evidence of a victim's violent conduct, the conduct must involve instances where the victim initiated the violence. If that condition is satisfied, the entirety of the violent event or incident initiated by the victim is potentially admissible.

The admission of Adjutant evidence is subject to the careful discretion of the trial judge, who "must carefully examine the particular circumstances of the case, and weigh the probative value of such evidence against its prejudicial effect." Morales, 464 Mass. at 312 n.16. And in the exercise of that discretion, a judge may reasonably exclude evidence regarding entire instances of victim-initiated violence, or alternatively limit the extent that a witness could testify about a particular violent incident initiated by a victim.

We now turn to the judge's exclusion of the evidence at issue in this case. "We do not disturb a judge's decision to admit [or exclude] evidence absent an abuse of discretion or other legal error." Zucco v. Kane, 439 Mass. 503, 507 (2003). A judge abuses his or her discretion where the judge made "a clear error of judgment in weighing the facts relevant to the decision, . . . such that the decision falls outside the range

of reasonable alternatives."  Deconinck, 480 Mass. at 264,

quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  A

judge's failure to recognize that he or she has discretion is

necessarily an error of law.  See Guilfoyle, 396 Mass. at 1004

("if a judge admits a record on the mistaken belief that he has

no discretion to exclude it, he has committed an error of law in

failing to recognize that he had discretion").  See also, e.g.,

Commonwealth v. Harris, 443 Mass. 714, 728-729 (2005) ("The

judge below thus erred in declining to exercise any discretion

. . . .  That the exercise of discretion could, had it been

undertaken, permissibly have resulted in the same decision to

exclude the [evidence] does not necessarily insulate the error

from reversal"); Commonwealth v. Knight, 392 Mass. 192, 194

(1984) ("[I]t is the duty of the judge to exercise [discretion],

and it is error as a matter of law to refuse to exercise it"

[citation omitted]); Commonwealth v. Fredette, 56 Mass. App. Ct.

253, 259 n.10 (2002) ("Failure to exercise discretion is itself

an abuse of discretion").

But reversal is warranted only where the requisite

prejudice to the aggrieved party is present.[6]  The amount of

---

[6] The defendant contends that reversal is required in this
case based on our statement in Adjutant that "[w]here the record
shows that the judge has failed to exercise discretion, there
exists an error of law requiring reversal" (citation omitted).
Adjutant, 443 Mass. at 666.  This statement from Adjutant has
been stated both directly and with slight variation in several

prejudice required to warrant reversal ultimately depends on whether the aggrieved party objected to the judge's evidentiary ruling.  Where a party has objected to the judge's ruling, we apply the prejudicial error standard.  "This means that we inquire[] whether there is a reasonable possibility that the error might have contributed to the jury's verdict" (quotation and citation omitted).  Commonwealth v. Wolfe, 478 Mass. 142, 150 (2017).  "An error is not prejudicial if it did not influence the jury, or had but very slight effect" (quotation and citation omitted).  Id.  However, where a party has not objected, we must determine whether the error resulted in a substantial risk of a miscarriage of justice.  See, e.g., Commonwealth v. McCoy, 456 Mass. 838, 845-846 (2010).  A substantial risk of a miscarriage of justice occurs when we have a "serious doubt whether the result of the trial might have been

---

prior cases.  See, e.g., Commonwealth v. Boyer, 400 Mass. 52, 57 (1987).  We now acknowledge that the portion of the sentence indicating that reversal is required was a misstatement of law.

There are only a small number of instances where an error at trial, in and of itself, requires reversal even without a showing of prejudice.  See, e.g., Commonwealth v. Oberle, 476 Mass. 539, 545 (2017) ("An erroneous denial of a peremptory challenge is a structural error, requiring reversal without a showing of prejudice").  Evidentiary rulings involving Adjutant evidence do not fall into that narrow category.  Rather, "[w]here the record shows that the judge has failed to exercise discretion, there exists an error of law requiring" a determination whether the prejudice created by the error, as dictated by the applicable standard of review, warrants reversal.  See Adjutant, supra.

different had the error not been made" (citation omitted).
Commonwealth v. Valentin, 470 Mass. 186, 189 (2014).

Although admittedly a close call, we agree with the
defendant that the trial judge failed to recognize the scope of
admissible Adjutant evidence and that her ruling was an error of
law. Specifically, the judge's statement that "[p]rior conduct
showing [the victim's] propensity" is not Adjutant evidence is
inconsistent with our Adjutant jurisprudence. Adjutant evidence
is by definition propensity evidence, although propensity
evidence admitted in limited circumstances, in a specific form,
and for a limited purpose. See, e.g., Commonwealth v. Camacho,
472 Mass. 587, 593 (2015); Chambers, 465 Mass. at 529-530;
Adjutant, 443 Mass. at 660. Moreover, the judge's statement
intimating that evidence of what a victim did after initiating
violence was beyond the scope of Adjutant demonstrates a belief
that Adjutant evidence is strictly limited to evidence that a
victim initiated violence, as opposed to evidence of the over-
all violent occurrence. Therefore, based on the judge's
statements, we conclude that the judge mistakenly believed she
did not have discretion to allow evidence regarding the entirety
of the violent incidents initiated by the victim. As such, her
failure to recognize her discretion necessarily constitutes

error.[7]  See, e.g., Knight, 392 Mass. at 194.  Because the judge erred in sustaining the Commonwealth's objection over defense counsel's protests, we apply the prejudicial error standard and must determine whether failing to admit evidence regarding the entirety of these two violent events "did not influence the jury, or had but very slight effect" (citation omitted).  Commonwealth v. Bregoli, 431 Mass. 265, 273 (2000).  See Commonwealth v. Wray, 88 Mass. App. Ct. 403, 405-406 (2015).  We conclude that the error was not prejudicial.

"[W]e do not speculate as to what the judge would have done had she recognized her discretion," Adjutant, 443 Mass. at 666, but ultimately we discern no prejudice from the exclusion of the additional testimony in light of the evidence that was admitted in support of the defendant's theory of self-defense.  Pursuant to Adjutant, evidence of these three separate violent acts by the victim were admitted, all of which showed the victim initiating physical violence and ultimately fighting with police officers.  Specifically, one officer testified that while the officer was working a paid detail at a bar in Fall River, the victim started a fight in an elevator and ultimately fought with both bouncers and the officer himself before the officer was

---

[7] We emphasize, however, that the judge has wide discretion as to what, if any, part of the specific instance of conduct should be admitted on the issue of who was the first to initiate violence or who was the first to threaten or use deadly force.

able to place the victim under arrest.  The officer told the jury that he needed the bouncers' help to arrest the victim because the victim would not stop fighting.  A second officer testified about how on a different occasion, at a different bar, three officers intervened in a fight involving the victim.  The officer described how when he told the victim to stop fighting, the victim not only did not stop fighting, but also responded by kicking the officer.  Finally, a third officer testified about another incident at a bar.  That officer explained that the victim got involved in yet another fight at a bar and the police officer went to escort the victim out of the bar.  Rather than leave the bar, the victim "ripped his arm away from [the officer]."  The victim then shoved the officer, and "a physical altercation between [the victim and the officer] ensued."

Moreover, the defendant testified that the victim had a reputation as a fighter.  While not Adjutant evidence, this evidence was admitted as to the state of mind induced in the recipient of this knowledge -- the defendant.  See, e.g., Fontes, 396 Mass. at 735 ("A defendant may present evidence of the victim's reputation as a violent or quarrelsome person and of his own knowledge of that reputation . . .").  See also Adjutant, 443 Mass. at 654 (victim's reputation as violent person and instances of victim's prior acts of violence are admissible "if known to the defendant, as it bears on the

defendant's state of mind and the reasonableness of his action in claiming to have acted in self-defense").  The jury also heard evidence about the repeated and quite explicit threats that the victim sent to the defendant, including that the victim "wanted to kick [the defendant's] ass," that the victim "was going to break [the defendant's] neck," that the victim "wanted [to] bust [the defendant's] head," and that the victim was going to "videotape [himself beating the defendant] and put it on YouTube."  See, e.g., Edmonds, 365 Mass. at 499-500, quoting Commonwealth v. Rubin, 318 Mass. 587, 588-590 (1945) ("Where self defence is invoked by a defendant, threats of violence made against him by the person hurt or killed by him are generally admissible, when known to the defendant before the act, as evidence of his apprehension for his own safety, and the reasonableness of that apprehension").  We also referenced in Adjutant this type of nonhearsay, nonpropensity evidence as it relates to the state of mind of the recipient of the information.  See Adjutant, supra at 654.

The evidence connecting the victim with violence and the defendant's knowledge of the victim's reputation for violence and his threats to the defendant went largely undisputed.  Based upon the Adjutant evidence, and the evidence of the defendant's knowledge of the victim's reputation for violence and his previous threats to the defendant, it is doubtful that

additional testimony from the officers about the victim's continued violence would have added much to the already significant evidence of the victim's violence. See, e.g., Commonwealth v. Smith, 460 Mass. 385, 398 (2011); Commonwealth v. Cyr, 433 Mass. 617, 625 (2001). We therefore discern no prejudice flowing from the judge's error.

b. Adjutant instructions. Proper limiting instructions are an integral part of a jury trial, and a judge's role in crafting those instructions is critical. Bad act or propensity evidence has a particular danger of creating undue prejudice, and in instances where such evidence is admitted, specificity and precision in the jury instructions both at the time the evidence is admitted and in final instructions is key. See, e.g., Commonwealth v. Samia, 492 Mass. 135, 148 n.8 (2023) ("We take this opportunity to emphasize the importance of specificity and precision in the context of ruling on bad act evidence"). While limiting instructions are essential when bad act evidence is admitted for a nonpropensity purpose, clear and precise jury instructions are perhaps of at least comparable importance when Adjutant evidence is admitted because it is one of the few instances where we allow the jury to make propensity inferences. As relevant to the defendant's claims, the judge gave the following instruction at trial:

"For purposes of determining who attacked whom first in the altercation, you may consider evidence of the deceased's prior past violent conduct, whether or not the defendant knew of it. You cannot consider such evidence for any other purposes whatsoever."

Although there were slight variations to her instructions during the trial, the judge gave substantially similar instructions each time Adjutant evidence was admitted and during the final charge.[8] While the defendant did not object to the instructions at trial, he now makes two challenges on appeal. He contends first that because the case was tried after

_____

[8] As relevant to Adjutant evidence, the Model Jury Instructions on Homicide in effect at the time of trial provided: "For the purpose of determining who attacked whom first in the altercation, you may consider evidence of the deceased's [and a third party acting together with the deceased's] past violent conduct, whether or not the defendant knew of it." Chambers, 465 Mass. at 528 n.8, quoting Model Jury Instructions on Homicide 28-29 & n.68 (2013).

Subsequently, the Model Jury Instructions on Homicide were amended in 2018. While the language quoted above remains the same, see Model Jury Instructions on Homicide 34 & n.82 (2018), the amended instructions have an additional instruction, which cites to Chambers, 465 Mass. at 528, and states:

"However, if the defendant was the first to use non-deadly force but the deceased [or a third party acting together with the deceased] was the first to use deadly force, such as by escalating a simple fist-fight into a knife fight, the defendant may claim self-defense where he responded to the escalation with deadly force."

Model Jury Instructions on Homicide 34 & n.81 (2018). Judges are encouraged "[i]n appropriate cases, [to] add [that] instruction" before giving the Adjutant instruction retained from the 2013 model instructions. See id. at 34. Compare Model Jury Instructions on Homicide 28-29 & n.68 (2013) with Model Jury Instructions on Homicide 34 & nn.81-82 (2018).

Chambers, the judge erred by not specifically instructing the jury that the victim's prior violence also could be considered to determine who escalated the confrontation by the threat or use of deadly force. Second, he contends that under Chambers, Adjutant evidence can be considered expansively to determine whether the Commonwealth disproved self-defense generally, and as such the judge's final sentence explicitly limiting the Adjutant evidence to the issue of who attacked whom first was also error. The defendant argues that these errors individually and collectively created a substantial risk of a miscarriage of justice warranting a new trial. We address each argument in turn.

i. Failure to expand the definition of first aggressor. "[A] trial judge is not constrained to use any particular language in his [or her] instructions; rather he [or she] is required only to provide a full and accurate explanation of the governing law applicable to a particular case." Commonwealth v. Berrio, 43 Mass. App. Ct. 836, 838 (1997). Additionally, "[a] judge is not required to instruct on a hypothesis that is not supported by the evidence." Commonwealth v. Gallett, 481 Mass. 662, 680 (2019), quoting Commonwealth v. Gould, 413 Mass. 707, 715 (1992).

The defendant contends that because Chambers expanded the definition of first aggressor, he was entitled to a jury

instruction that explained that <u>Adjutant</u> evidence could be considered to determine both who started the fight and who escalated the fight by the threat or use of deadly force.  As a general proposition, we agree with the defendant that, because <u>Adjutant</u> evidence is admissible to determine not only who initiated the fight but also who escalated it to one involving deadly force, the jury should, when both issues are raised at trial, be instructed accordingly.  However, just as the disputed issues at trial ultimately determine whether <u>Adjutant</u> evidence is admissible, the disputed issues at trial necessarily determine the appropriate jury instruction.

A prerequisite to the admissibility of <u>Adjutant</u> evidence is that the identity of either the first to initiate violence or the first to escalate the conflict through the threat or use of deadly force be in dispute.  See, e.g., <u>Camacho</u>, 472 Mass. at 593.  Where neither issue is in dispute, <u>Adjutant</u> evidence is not admissible.  <u>Id</u>. at 594 (no error in excluding <u>Adjutant</u> evidence where "the primary question for the jury was not who began the altercation or escalated it to deadly force, but rather whether the defendant was legally entitled to use the force that he did in defense of another").  Where only one of those issues is in dispute, <u>Adjutant</u> evidence is admissible in order for the jury to determine that one issue.  See <u>id</u>. at 593-594.  And where both issues are in dispute, <u>Adjutant</u> evidence is

admissible in order for the jury to determine both issues.  See id.  Therefore, the instruction to which the defendant contends he was entitled is only required where the evidence demonstrates a dispute as to who "initiated the use or threat of deadly force."  See, e.g., Chambers, 465 Mass. at 529-530.  See also Gallett, 481 Mass. at 680.  Cf. Camacho, supra.

Here, the defendant's position at trial was that the victim was killed in lawful self-defense.  Like many of our cases where Adjutant evidence was admissible, there was inconsistent testimony about how the fatal fight began.  Cf. Pring-Wilson, 448 Mass. at 723-724 (defendant's version of fight "differed markedly" from that of witnesses).  Specifically, there was conflicting evidence about how the fight began, how it progressed, and even how many people were involved in it.  Crucially, however, it was undisputed that during what was essentially a fist fight, the defendant had a firearm, produced said firearm, and fired it.  Given the largely undisputed evidence on that point, including the defendant's admission to firing a "warning shot" after he was hit, there was no question that the defendant was the first to introduce deadly force.  See Commonwealth v. Klein, 372 Mass. 823, 827 (1977) ("[D]eadly force [is defined] as force intended or likely to cause death or great bodily harm. . . .  Clearly the defendant in this case used deadly force in firing shots from a handgun").  Thus, the

key questions for the jury were who started the confrontation and whether the defendant was legally entitled to use the force that he did.  Cf. Camacho, 472 Mass. at 594-596.  The identity of the person who escalated the conflict to one involving deadly force was not in dispute.  Therefore, the defendant was not entitled to an instruction informing the jury that the Adjutant evidence could be considered to determine who threatened deadly force or escalated the conflict to one involving deadly force. As such, there was no error.

While there was no error in this case, and the current Model Jury Instructions on Homicide appropriately cite to both Adjutant, 443 Mass. at 664, and Chambers, 465 Mass. at 528, see Model Jury Instruction on Homicide, 33-34 & nn. 81-82 (2018), we take this opportunity, in the Appendix to this opinion, to revise the current instruction in order to more concisely and understandably explain how the jury may consider Adjutant evidence.  Henceforth, where the identity of the person who first threatened or used deadly force is at issue, a judge's instruction should inform the jury that the victim's prior acts of violence may also be considered in order to make that determination.  See Deconinck, 480 Mass. at 263-264.  Where the identity of the person who started the fight and the identity of the person who escalated the fight are in dispute, a judge's instruction should explicitly inform the jury that the victim's

prior acts of violence may be considered for both purposes.  See id.

ii.  Final limiting sentence.  The defendant next contends that the final sentence of the judge's charge instructing the jury that they could only consider the Adjutant evidence to determine who attacked whom first was error.  He argues that pursuant to Chambers, 465 Mass. at 529, Adjutant evidence is broadly admissible so that the jury may determine whether the Commonwealth proved the defendant did not act in self-defense as a general matter.  We disagree and conclude that such an instruction excluding from the jury's consideration the use of the Adjutant evidence more broadly so as to determine whether the Commonwealth had proved lack of self-defense was not error.

As explained in detail supra, we clarified in Chambers, 465 Mass. at 528-530, that the term "first aggressor" is not limited to the person who provoked or initiated the confrontation but includes the person who escalated a confrontation from one involving nondeadly force to one involving deadly force.  See Deconinck, 480 Mass. at 263.  While conducting our analysis in Chambers, after explaining the origins and purpose of the rule from Adjutant, but before clarifying the term "first aggressor," we made the following statements:

> "It is important to note that, although Adjutant evidence may assist a jury to determine whether the defendant has lost the right of self-defense, it is not limited to this

purpose.  In the Adjutant case, as in this case, the jury were not instructed that a first aggressor loses the right to claim self-defense, so we reasonably may infer that the contested evidence was not admitted for the purpose of addressing that issue.  Rather, it was admitted for the broader purpose of giving the jury relevant information regarding the victim's prior acts of violence that may help them to evaluate the conflicting evidence, to arrive at the truth regarding the events that led to the victim's death, and ultimately to determine whether the prosecution has met its burden of proving that the defendant did not act in self-defense."

Chambers, supra at 529.

The defendant contends that this language was a pronouncement by this court expanding the permissible use of Adjutant evidence, such that it may be broadly considered "to determine the overall question of whether the Commonwealth proved that the defendant did not act in proper self-defense." This argument takes the quoted language out of context.  This language is part of a broader discussion explaining the law of self-defense and its intersection with Adjutant evidence before clarifying and expanding our understanding of the term "first aggressor."  See Chambers, 465 Mass. at 528-530.  And while we have repeatedly emphasized that the purpose of our decision in Chambers was to expand or clarify the definition of first aggressor, see, e.g., Deconinck, 480 Mass. at 263; Camacho, 472 Mass. at 593, we acknowledge that the language upon which the defendant relies has potential to create confusion.  Therefore, we take this opportunity to explicitly articulate the limited

purposes for which Adjutant evidence may be considered within the broader context of self-defense.

Adjutant evidence is not broadly admissible to determine whether the Commonwealth has disproved self-defense. As we explained in our original Adjutant decision, and have consistently reiterated in subsequent cases, Adjutant evidence is admissible for the "limited purpose of supporting the defendant's self-defense claim that the victim was the first aggressor" (emphasis added). Adjutant, 443 Mass. at 660. Adjutant evidence is exclusively admissible to help the jury identify who initiated the conflict and who was the first person to use deadly force when relevant to the issue of self-defense. See Chambers, 465 Mass. at 530 ("the resolution of [who initiated the violence or escalated the conflict by the use or threat of deadly force] may assist the jury in deciding whether the prosecution has met its burden of proving that the defendant did not act in self-defense"). Cf. Camacho, 472 Mass. at 594 ("Neither the identity of the person who threw the bottle nor the identity of the person who fired shots is in dispute, and the limited sweep of Adjutant and Chambers does not authorize the introduction of evidence to shed light on any other question").

Limiting the scope of Adjutant evidence is consistent with our recognition that when the "first aggressor," as defined by

Adjutant, 443 Mass. at 649-650, 664, and Chambers, 465 Mass. at 528-530, is disputed, evidence about the victim's prior violent conduct is considered relevant and probative to determining who the first aggressor was. Comacho, 472 Mass. at 591-592. Moreover, this limitation on Adjutant evidence strikes the requisite balance between the primary purpose of allowing Adjutant evidence -- "to give the jury a full picture of the altercation so as to make an informed decision about the identity of the first aggressor," Deconinck, 480 Mass. at 263, quoting Pring-Wilson, 448 Mass. at 737 -- and our general distrust of propensity evidence, Adjutant, supra at 661-662. As such, we discern no error in the judge instructing the jury in this case that they were not permitted to consider the victim's prior bad acts for any purpose other than determining who attacked whom first.

2. Prosecutor's closing argument. The defendant next claims that the prosecutor misstated evidence in his closing argument. He specifically takes issue with the prosecutor's first few sentences: "'Tell Kyle Brady I've got something for him. Tell Kyle Brady I've got something for him.' Those are the words that this defendant used outside of [the bar] when he was talking to [Emond]."

"Although 'counsel may argue the evidence and the fair inferences which can be drawn from the evidence,' . . . 'a

prosecutor should not . . . misstate the evidence of refer to facts not in evidence.'" Kapaia, 490 Mass. at 804, quoting Commonwealth v. Cheng Sun, 490 Mass. 196, 221 (2022). "Such arguments are improper." Kapaia, supra. Because there was no objection lodged at trial, we review to determine whether any error created a substantial risk of a miscarriage of justice. See Commonwealth v. Carroll, 439 Mass. 547, 554 (2003).

The defendant's statement was that "he had something for Kyle Brady," not "Tell Kyle Brady I've got something for him." As such, the prosecutor's statement to some extent misstated the evidence. "Because the prosecutor's statement was improper, 'we are guided by the following factors when deciding whether' the error created a substantial [risk] of a miscarriage of justice: '[(1)] whether defense counsel seasonably objected to the arguments at trial . . . [(2)] whether the judge's instructions mitigated the error . . . [(3)] whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . [(4)] whether the jury would be able to sort out the excessive claims made by the prosecutor . . . and [(5)] whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant.'" Kapaia, 490 Mass. at 804 & n.13, quoting Commonwealth v. Teixeira, 486 Mass. 617, 635 (2021). No one factor is dispositive, and our ultimate focus is whether we have a serious doubt that the result of the

trial might have been different had the statement not been made. Kapaia, supra at 804 n.13. See Commonwealth v. Dirgo, 474 Mass. 1012, 1016-1017 (2016).

Although the statement was technically inaccurate, we discern no substantial risk of a miscarriage of justice. The prosecutor's statement was a minor deviation from what the defendant actually said. It occupied only two lines of an approximately fifteen-page closing argument. See Kapaia, 490 Mass. at 804-805. Moreover, the judge properly "instructed the jury that closing arguments are not evidence and that, to the extent an attorney's statement conflicts with their memory, it is the jury's memory that controls." Id. at 805. See Commonwealth v. Salazar, 481 Mass. 105, 118 (2018) (where judge properly instructed jury that closing arguments were not evidence, brief isolated statement was "not egregious enough to infect the whole of the trial"). "Furthermore, '[w]e ascribe a certain level of sophistication to the jury, and, [on this record], have little doubt that they would not have been swayed by this [misstatement].'" Kapaia, supra, quoting Commonwealth v. Wilkerson, 486 Mass. 159, 181 (2020).

3. Ineffective assistance of counsel. In his motion for a new trial, the defendant argued that trial counsel was ineffective in failing to present additional easily obtainable evidence about the victim's reputation for violence and

additional instances of prior violence initiated by the victim. He maintains this argument on appeal.

Where, as here, the defendant claims that trial counsel was ineffective, "we ask whether counsel's performance fell 'measurably below that which might be expected from an ordinarily fallible lawyer,' and 'likely deprived the defendant of an otherwise available, substantial ground of defence.'" Commonwealth v. Henry, 488 Mass. 484, 497 (2021), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). "The burden of proving entitlement to a new trial based on ineffective assistance of counsel rests on the defendant." Commonwealth v. Watson, 455 Mass. 246, 256 (2009). "A defendant must show that better work might have accomplished something material for the defense." Id. "A strategic or tactical decision by counsel will not be considered ineffective assistance unless the decision was manifestly unreasonable when made" (quotation and citation omitted). Id. Only decisions that a lawyer of ordinary training and skill in criminal law would not consider competent are manifestly unreasonable. Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).

Here, trial counsel's strategy in support of the victim's self-defense claim involved showing the jury that the victim was a "violent person with a history of getting into fights." This

focus on the victim's violence was present in both trial counsel's opening statement and closing argument. And the argument that the victim was a ferocious and violent person was supported by the evidence. During the defendant's case-in-chief, three police officers testified about three separate violent fights initiated by the victim, and the defendant himself testified about both the victim's reputation as a fighter and the threatening messages that the victim had been sending him in the months preceding the conflict.

In essence, the defendant's claim of ineffective assistance of counsel is that trial counsel was ineffective by failing to present even more evidence about the victim's violence. Although some of evidence that the defendant contends should have been presented involved different violent acts by the victim, there already was powerful <u>Adjutant</u> evidence and evidence regarding the defendant's knowledge of the victim's reputation for violence that was properly admitted to support the defendant's theory of self-defense. The evidence that the defendant contends should have been offered would have been admitted for the same purpose and to support the same theory of the case, thereby rendering it cumulative.[9] And "[t]he failure

---

[9] By stating that the evidence was cumulative, we express no view on how the trial judge might have exercised her discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," inter alia,

to offer cumulative evidence is not ineffective assistance of counsel."  Commonwealth v. Drew, 447 Mass. 635, 650 (2006), cert. denied, 550 U.S. 943 (2007).  See Commonwealth v. Britt, 465 Mass. 87, 94 (2013) ("The decision not to raise cumulative evidence merely for quantity's sake does not constitute ineffective assistance of counsel").  Therefore, trial counsel was not ineffective for failing to offer this additional evidence.

4.  Firearm convictions.  Finally, the defendant challenges his conviction of carrying a firearm without a license and carrying a loaded firearm without a license based on the absence of a jury instruction requiring the Commonwealth to prove that the defendant did not have a valid license to possess a firearm. Recently, in Guardado, 491 Mass. at 690, 693, we held that "to convict a defendant of unlawful possession of a firearm, the Commonwealth must prove as an element of the crime charged that the defendant in fact failed to comply with the licensure requirements for possessing a firearm" (quotation and citation omitted).  Id. at 690.  Our decision was based on the United States Supreme Court's recognition, in New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2122 (2022) (Bruen), that the Second Amendment to the United States Constitution

_____

"needlessly presenting cumulative evidence" if the evidence had been offered.  Mass. G. Evid. § 403.

protects an individual's right to carry a firearm outside the
home.  For that reason, our precedent predicated on a narrower
view of the rights secured by the Second Amendment, see
Commonwealth v. Gouse, 461 Mass. 787, 807 (2012), no longer was
valid.  Guardado, supra at 689-690.  The Guardado holding
applied prospectively and to those cases, like this one, that
were active or pending on direct review as of the date of the
issuance of Bruen.

Without the benefit of the Supreme Court's holding in
Bruen, or of our ruling in Guardado, the judge did not instruct
the jury that the Commonwealth was required to prove an absence
of a valid license, and the defendant did not object to the
instructions.  When the issue appealed is not preserved, we
usually grant relief only if the error created a substantial
risk of a miscarriage of justice.  In Guardado, however, we
applied the "clairvoyance exception" to excuse the failure to
object to the absence of a jury instruction on licensure because
"the constitutional theory on which the defendant . . . relied
was not sufficiently developed at the time of trial . . . to
afford the defendant a genuine opportunity to raise his claim."
Guardado, 491 Mass. at 686, quoting Commonwealth v.
Rembiszewski, 391 Mass. 123, 126 (1984).  Here, similarly, the
defendant did not have an "an adequate opportunity at the time
of his trial to raise the present issue."  Guardado, supra.

Because the clairvoyance exception applies, "[t]he remaining question is whether the error was harmless beyond a reasonable doubt." Commonwealth v. D'Agostino, 421 Mass. 281, 286-287 (1995).

Here, as the Commonwealth concedes, no evidence was admitted at trial that would suggest the defendant did not have a license to carry a firearm. As such, we cannot say that the judge's failure to instruct was harmless beyond a reasonable doubt and therefore vacate the defendant's convictions of carrying a firearm without a license and carrying a loaded firearm without a license.[10]

Conclusion. For the reasons set forth supra, we affirm the defendant's convictions of murder in the second degree and assault and battery by discharge of a firearm and the orders denying his motions for a new trial and for reconsideration. However, we vacate the convictions of carrying a firearm without a license and carrying a loaded firearm without a license and remand for further proceedings consistent with this opinion.

So ordered.

---

[10] The issue whether retrial shall be permitted is currently pending before the court and is scheduled for oral argument in September 2023. See Commonwealth vs. Guardado, No. SJC-13315. The rescript in this opinion shall be stayed pending our decision in that case.

<u>Appendix</u>.


<u>Model Jury Instruction -- Adjutant evidence</u>.

For the purpose of determining who attacked whom first in the altercation [or who escalated the potential for violence through the use or threat of deadly force], you may consider evidence of the deceased's [and a third party acting together with the deceased's] past violent conduct, whether or not the defendant knew of it.  You may not consider such evidence for any other purpose.